194 F.3d 323 (2nd Cir. 1999)
 SCHLAIFER NANCE &AMP; COMPANY, INC., Plaintiff-Counter-Defendant-Appellant,
POWELL, GOLDSTEIN, FRAZER &AMP; MURPHY, LLP, JAMES C. RAWLS, C. SCOTT GREENE, PAUL K. ROONEY, ESQ., Appellants,
v.
THE ESTATE OF ANDY WARHOL, Defendant-Counter-Claimant-Appellee,
FREDERICK HUGHES, VINCENT FREMONT and EDWARD W. HAYES, ESQ. Defendants-Appellees.
 Docket Nos. 98-7931(L), 98-7939(CON), 98-7940(CON)
August Term 1998
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Argued: July 1, 1999
Decided: October 19, 1999
 
 Appeal from an order of the United States District Court for the Southern District of New York (Denny Chin, Judge) granting the defendants' motion for sanctions pursuant to 28 U.S.C. 1927 and the District Court's inherent power. We hold that the District Court exceeded its allowable discretion in granting the motion.
 Reversed.[Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted]
 ANDREW L. FREY, Mayer, Brown & Platt, New York, NY (Melanie L. Oxhorn, of counsel), for Plaintiff-Counter-Defendant-Appellant Schlaifer Nance & Company, Inc.
 OTTO G. OBERMAIER, Weil, Gotshal & Manges, LLP, New York, NY (Paul K. Rooney, Dana B. Zimmerman, Paul K. Rooney, P.C., of counsel), for Appellant Paul K. Rooney.
 PAUL J. CURRAN, Kaye, Scholer, Fierman, Hays & Handler, LLP, New York, NY (Jenny Pearlman, Richard R. Mammon, of counsel), for Appellants Powell, Goldstein, Frazer & Murphy, LLP, James C. Rawls, and C. Scott Greene.
 PAUL J. HANLY, JR., Coblence & Warner, New York, NY (Robert P. Boatti, of counsel), for Defendant-Counter-Claimant-Appellee The Estate of Andy Warhol and Defendants-Appellees Frederick Hughes, Vincent Fremont, and Edward W. Hayes, Esq.
 Before: KEARSE, STRAUB, and POOLER, Circuit Judges.
 STRAUB, Circuit Judge:
 
 
 1
 The appellants-plaintiff Schlaifer Nance & Company, Inc. ("SNC"), the law firm of Powell, Goldstein, Frazer & Murphy, LLP ("PGFM"), PGFM attorneys James C. Rawls and C. Scott Greene, and attorney Paul K. Rooney-appeal from an order of the United States District Court for the Southern District of New York (Denny Chin, Judge), granting the motion of the defendants-appellees-the Estate of Andy Warhol, the Estate's executor, Frederick Hughes, his assistant Vincent Fremont, and the Estate's counsel, Edward W. Hayes-and sanctioning the appellants, jointly and severally, in the amount of $400,000 for their roles in the pursuit of a civil fraud action against the defendants-appellees. The District Court found that the plaintiff's fraud claim was completely without a colorable basis, that the appellants' continued litigation was pursued in bad faith, and therefore, that sanctions were appropriate pursuant to 28 U.S.C. 1927 and the court's inherent power. See Schlaifer Nance & Co. v. Estate of Andy Warhol, 7 F. Supp. 2d 364 (S.D.N.Y. 1998) ("Schlaifer V").
 
 
 2
 We hold that these findings are clearly erroneous and, as a result, the District Court exceeded its allowable discretion in granting the motion. We therefore reverse.
 
 BACKGROUND
 
 3
 The appeal presently before us is the latest chapter of a dispute that has simmered in the District Court since the early 1990s and that once before had found its way to this Court. See Schlaifer Nance & Co. v. Estate of Andy Warhol, 119 F.3d 91 (2d Cir. 1997) ("Schlaifer IV"). Thus, we are no strangers to the underlying facts of this case. Nevertheless, because the inquiry into the propriety of sanctions is critically dependent on the precipitating and developing facts below, we take the time to set forth with some detail the events that culminated in the current appeal.
 
 
 4
 SNC is a Georgia licensing company founded by Roger Schlaifer and Susanne Nance Schlaifer that is engaged in the business of marketing famous names and images. See id. at 93; Schlaifer Nance & Co. v. Estate of Andy Warhol, 927 F. Supp. 650, 652 (S.D.N.Y. 1996) ("Schlaifer III"), aff'd, 119 F.3d 91 (2d Cir. 1997). In late 1985, Roger Schlaifer sought to negotiate a licensing agreement with the commercial artist Andy Warhol. Warhol was represented by his business associate, Frederick Hughes, who, upon Warhol's sudden death in 1987, was appointed executor of Warhol's estate. As executor, Hughes, together with the Estate's counsel Edward Hayes, continued negotiations with Roger Schlaifer until they signed a licensing agreement ("Agreement") in the fall of 1987. See Schlaifer IV, 119 F.3d at 94.
 
 
 5
 This Agreement "was quite broad, and granted SNC many rights to license Warhol's artworks, name and likeness for items in the fashion, home decorating, gift, toy and entertainment industries." Id. SNC, however, became disenchanted with it when the Estate "began to disclose numerous problems regarding control over the rights to Warhol's works," specifically, third-parties who also asserted rights over certain Warhol works. Id. at 95-96.
 
 
 6
 Thus, as a previous panel of this Court explained,
 
 
 7
 [i]nfuriated by this sudden cascade of outside interests, SNC filed a complaint against the Estate in the Southern District of New York, alleging fraud and breach of the Licensing Agreement. SNC complained that for its licensing program to work effectively, it had to acquire the exclusive rights to all of Warhol's artworks.... SNC alleged that the Estate misled SNC by misrepresenting that it had exclusive control of Warhol's assets, and by not explaining that many of Warhol's works had fallen into the public domain.
 
 
 8
 Id. at 96. Soon after filing its initial complaint, SNC filed a second lawsuit, making additional allegations of breach of the Agreement. See Schlaifer Nance & Co. v. Estate of Andy Warhol, 764 F. Supp. 43, 44 (S.D.N.Y. 1991) ("Schlaifer I"). While these actions were pending in the District Court, SNC also submitted a claim in arbitration pursuant to an arbitration clause in the Agreement. See Schlaifer IV, 119 F.3d at 96. The arbitrators awarded a total of slightly over $4 million in damages to SNC for the Estate's conduct that occurred after the execution of the Agreement. See id. Of this amount, $1.5 million were in punitive damages, largely to reimburse SNC for its $1.46 million in legal fees.
 
 
 9
 "SNC then amended its pending [original] complaint in federal court to add Hayes, Hughes, and ... Fremont, as defendants" as well as a civil RICO claim against them. Id. at 96. The defendants moved to dismiss both complaints "on the basis that SNC had prevailed on its claims in the arbitration." Schlaifer V, 7 F. Supp. 2d at 367. By memorandum endorsement filed on September 16, 1992, the District Court (Louis L. Stanton, Judge) denied the motion as to the original complaint and granted the motion on consent as to the second complaint. The District Court held that the arbitrators had awarded damages "only for post-contract expenses," but not for SNC's "pre-contract expenses." Id. In addition, it noted that the individual defendants had not been parties to the arbitration, and that the RICO claim had not been presented in the arbitral proceeding. As a result, the District Court concluded that the arbitration proceeding did not preclude SNC's action. See id.
 
 
 10
 On May 18, 1993, SNC filed a second amended complaint alleging fraud against the Estate as well as fraud and civil RICO against the individual defendants. The defendants again moved to dismiss the complaint, which the District Court granted by memorandum endorsement filed on February 18, 1994, with respect to the civil RICO claim. It also dismissed the fraud claim as to Hayes and Fremont, although with leave to replead. The District Court, however, allowed the fraud claim against the Estate and Hughes to stand, holding that the claim was pled with sufficient particularity.
 
 
 11
 SNC then filed a third amended complaint on April 4, 1994, repleading its fraud claim against Hayes but not Fremont. The defendants moved to dismiss yet again, this time arguing that "SNC could not have relied on the alleged misrepresentations because they were contradicted by the language of the Agreement." Schlaifer Nance & Co. v. Estate of Andy Warhol, No. 90 Civ. 1095, 1995 WL 66408, at *1 (S.D.N.Y. Feb. 15, 1995) ("Schlaifer II"). The District Court denied this motion as well, holding that the Agreement did not "foreclose SNC's claim of justifiable reliance." Id.
 
 
 12
 On February 23, 1995, SNC's action, consisting only of the fraud claim against the Estate, Hughes, and Hayes, was reassigned for trial (Denny Chin, Judge). On March 29, 1995, the defendants inquired of SNC whether all documents responsive to document requests served on SNC in 1990 and 1993 had been produced. On April 19, 1995, just two months prior to trial, SNC produced over 3,000 documents, many of which, in the later view of the District Court, "showed that SNC and its attorneys were actually aware of, or suspected, that there were many problems with respect to the Estate's ownership of copyrights" in Warhol's works. Schlaifer V, 7 F. Supp. 2d at 368.
 
 
 13
 Nevertheless, despite this belated production, the case proceeded to trial on June 20, 1995. SNC's allegations centered on several specific statements or omissions made by the Estate that SNC claimed were fraudulent. Among these, the most significant were: (1) Hughes's statement on May 18, 1987, that the Estate owned or controlled all the rights to Warhol's works; (2) Hayes's failure to disclose copyright problems in response to SNC's expressed desire to have "exclusive rights;" (3) Hughes's denial at a November 1987 meeting of the existence of a "watch deal" between the Estate and a watch manufacturer; (4) representations and warranties in the Agreement itself; and (5) various representations in an opinion letter ostensibly issued by a law firm, including the representation that "[t]he Estate possesses all right, title and interest" in Warhol's works "necessary to enable it to perform under the Agreement." Plaintiff's Trial Exhibit 36.
 
 
 14
 At the close of SNC's case, the defendants moved for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a). Although prior to the close of the plaintiff's case, the District Court had "expressed concern as to whether SNC's claim had any merit," it nevertheless reserved decision on this motion. Schlaifer V, 7 F. Supp. 2d at 371. At the conclusion of the submission of all of the evidence, the defendants renewed their Rule 50 motion. Again the District Court reserved its decision, allowing SNC's claim to go to the jury. As the District Court subsequently explained, it "did so only because the Second Circuit has suggested that it is better practice to let the jury decide a case and then set it aside to avoid the need for a retrial in the event of a reversal on appeal." Id.
 
 
 15
 On June 27, 1995, the jury returned a verdict finding that the defendants had fraudulently induced SNC to enter into the Agreement. The parties had previously agreed, following several rulings by the District Court, that the amount of actual damages to be awarded to SNC should it prevail was $63,941, and the jury added an award of $1 million in punitive damages against each defendant. The defendants then moved to set aside the verdict and for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b).
 
 
 16
 On May 15, 1996, the District Court granted the Rule 50(b) motion, concluding that "[t]he jury's finding of fraud and its award of a total of $3 million in punitive damages could only have been the product of sheer surmise and speculation." Schlaifer III, 927 F. Supp. at 652. As the District Court subsequently explained, its "decision to set aside the verdict was based primarily on [its] conclusion that no reasonable jury could have found that SNC reasonably relied on defendants' false representations that the Estate owned all the rights to all of Warhol's works." Schlaifer V, 7 F. Supp. 2d at 371. The District Court's conclusion was premised on the following findings with respect to each of the alleged misrepresentations previously identified by the plaintiff.
 
 
 17
 First, Hughes had told SNC in December of 1985 that Warhol owned copyrights on "most"-as opposed to all-of his images, and in the summer of 1986, Hughes had informed SNC that Warhol was pursuing a number of "small deals," including a watch deal. Schlaifer III, 927 F. Supp. at 662. Indeed, the District Court concluded that SNC was aware that the Estate was pursuing a licensing agreement with a watch company (referred to as the "North American Watch" deal) in as early as August of 1986. See id. at 662. It noted that Hughes had asked Roger Schlaifer, in March or April 1987, whether SNC would allow such a deal, and that Roger Schlaifer had given his approval but never informed SNC's attorneys of this fact. See id. at 662-63.
 
 
 18
 In addition, the District Court concluded that the Agreement itself indicated that the Estate did not own the rights to all of Warhol's works. See id. at 663. The District Court noted that: (1) Exhibit D to the Agreement-termed "Existing Artworks"-listed all Warhol works known to the Estate, and the Agreement specifically cautioned that Exhibit D "may not be a complete listing;" (2) Exhibit D indicated that the rights to some of the listed works were held by third parties; (3) Section 4(a) of the Agreement provided that any Warhol works added to the list of Existing Artworks shall have their copyright statuses indicated; and (4) Section 9 provided for the possibility of an inadvertent breach of the warranties in the Agreement with respect to the ownership of the copyrights of the Existing Artworks. See id.
 
 
 19
 Furthermore, the District Court concluded that an opinion letter from a law firm ostensibly guaranteeing the Estate's copyrights in Warhol's works was patently unreliable. See id. at 663-64. The District Court initially noted that the letter was not received until after SNC had executed the Agreement, and therefore, could not have been relied upon. See id. The District Court also found that the letter was facially defective because it was dated before the Agreement was executed and made reference to an agreement that did not yet exist. See id. at 656, 663. Moreover, the District Court determined that the "firm" from which the letter ostensibly came not only did not work for the Estate, but did not exist at all, see id. at 656, a fact of which SNC should have been aware because it had never previously dealt with the firm or the individuals claiming to constitute the firm, see id. at 663-64. Despite the fact that it knew or should have known of the inaccuracies and falsehoods in the opinion letter, SNC failed to investigate the letter or ask for a proper one. Thus, the District Court concluded that SNC could not have reasonably relied on it. See id.
 
 
 20
 Most significantly, the District Court stated that additional evidence at trial clearly indicated that SNC could not have reasonably believed that the Estate's rights to Warhol's works were absolute. For instance, a 1985 book concerning Warhol's art which SNC reviewed prior to execution of the Agreement indicated that third parties held some copyrights to Warhol's works and that many of Warhol's works lacked copyright notices. See id. at 654, 657, 662. Additionally, SNC's own attorneys expressed concern as to the reliability of the Estate's representations. In her deposition, one of SNC's attorneys testified that when drafting the Agreement in 1987, she believed that the sheer number of Warhol's works precluded the Estate from holding rights to all of them. See id. at 657. This sentiment was echoed by another SNC attorney in a note dated October 15, 1987. See id. at 658; see also id. at 662. Furthermore, there was evidence that both Susanne Nance Schlaifer and Roger Schlaifer were aware of the inadequacies in the Estate's representations. For example, a note dated October 16, 1987, written by Susanne Nance Schlaifer, recounted a telephone conversation she had with counsel warning of potential problems if Warhol had failed to copyright his works or to put copyright notices on them. See id. at 658, 662. And Roger Schlaifer had testified in April 1988 in another legal proceeding that he noticed that a number of Warhol's works in Exhibit D to the Agreement were not copyrighted. See id. at 657; see also id. at 662. Last, the evidence indicated that prior to execution of the Agreement, the Estate specifically sought to limit its obligation to provide updated copyright information on a "best efforts basis." Id. at 662 (internal quotation marks omitted). In light of these findings, the District Court concluded that SNC's claim failed as a matter of law for the lack of reasonable reliance. See id. at 664.
 
 
 21
 SNC appealed the District Court's decision, but we affirmed for substantially the same reasons articulated by the District Court. See Schlaifer IV, 119 F.3d at 98-102. We noted that "[t]he parties involved in this litigation [were] not widows or orphans," id. at 98, and held that SNC's fraud claim was precluded as a matter of law because of the lack of reasonable reliance, see id. at 102.
 
 
 22
 After we issued our mandate on September 12, 1997, the Estate sought and obtained from the District Court the taxable costs of the case pursuant to Fed. R. Civ. P. 54. Then on October 31, 1997, the Estate notified the District Court of its intention to move for sanctions pursuant to Fed. R. Civ. P. 11, Fed. R. Civ. P. 26, 28 U.S.C. 1927, and the District Court's inherent power.
 
 
 23
 In an order dated November 11, 1997, the District Court set forth some "preliminary thoughts" on the issue. Schlaifer V, 7 F. Supp. 2d at 371. It noted that while it was too late to consider sanctions under Rules 11 and 26, the other two bases for sanctions were still available. The District Court, however, encouraged the parties to try to resolve the matter, and set a schedule for the submission of briefs only in the event the parties could not reach a settlement. The parties failed to reach a resolution, and submitted their briefs pursuant to the District Court's order, i.e., the Estate's brief was filed by December 11, 1997, SNC's opposition was filed by January 5, 1998, and the Estate's reply was filed by January 16, 1998. On May 28, 1998, the District Court issued an order seeking information from the parties concerning legal fees. In the cover letters attached to their separate responses to the District Court's May 28 order, the appellants sought a hearing on the motion for sanctions, which the District Court denied. See id. at 373 n.9.
 
 
 24
 In an opinion dated June 3, 1998, the District Court imposed sanctions on PGFM, Rawls, Greene, and Rooney, pursuant to 28 U.S.C. 1927, and against all the appellants pursuant to its inherent power. See id. at 379-80. The amount of the sanctions was $400,000, for which the appellants were liable jointly and severally. See id. The District Court concluded that SNC's fraud claim, given all the evidence undermining reasonable reliance, was without a colorable basis and was pursued in bad faith, thus meeting the two requirements for the imposition of sanctions under 1927 and the District Court's inherent power. See id. at 375-78.
 
 
 25
 With respect to the colorability of SNC's claim, the District Court found that the appellants had an obligation to investigate the truth of the Estate's representations, that they had the means of knowing the truth of the Estate's representations, and that, irrespective of the two prior points, they actually knew that the Estate did not hold exclusive copyrights to all of Warhol's works. See id. at 375-76. The District Court dismissed the significance of the fact that SNC's claim survived three motions to dismiss, as well as the fact that it had allowed the claim to go to the jury. See id. at 376. The District Court also concluded that the jury verdict in favor of SNC was irrelevant, given the District Court's subsequent determination that no rational juror could have found reasonable reliance. See id.
 
 
 26
 With respect to the bad faith of the appellants, the District Court found that by holding what it described as a "patently frivolous" position concerning SNC's reasonable reliance, the fraud action was "'so completely without merit as to require the conclusion that [the prosecution of the fraud claim] must have been undertaken for some improper purpose.'" Id. at 376 (quoting Keller v. Mobil Corp., 55 F.3d 94, 99 (2d Cir. 1995)) (alteration in original). In addition, the District Court also determined that the appellants "knew there was no factual basis for the claim of reasonable reliance." Schlaifer V, 7 F. Supp. 2d at 376-77. It concluded that Rawls and Greene, as attorneys, "had a duty to question whether there was a good faith basis for continuing with the lawsuit" when the April and May, 1995, production from SNC came to light, id. at 377, because these documents contained evidence indicating that SNC had actual knowledge of the falsity of the Estate's representations, see id. at 368-69. Furthermore, based on Roger Schlaifer's contradictory testimony of April 1988, the District Court found that Roger Schlaifer had lied when he testified at trial that prior to signing the Agreement, he had "'absolutely no knowledge that Warhol works were without copyright protection,'" id. at 377 (quoting Trial Transcript), and that the use of this testimony under the circumstances further evidenced bad faith, see id. Additionally, the District Court noted that the disproportionate amount of money SNC's attorneys spent pursuing a claim that had been limited to $63,941 in compensatory damages, and that SNC's continued prosecution of this action despite having already won a significant award in arbitration, manifested vindictiveness and an intent to harass. See id. at 377. Similarly, the District Court concluded that the switch by SNC's attorneys to a contingency fee arrangement in December of 1991, in view of the comparatively small amount at stake, evidenced the "desire of the attorneys to rack up legal fees." Id. Last, the District Court concluded that SNC's attorneys litigated SNC's claim with an "unreasonable tenacity," as indicated by, inter alia, their bringing a simple breach of contract case as a fraud and civil RICO action, by trying to subpoena two witnesses for an unreasonable amount of time, and by trying to use video or photographs of one of the defendants to use his appearance to generate hostility against him. See id.
 
 
 27
 The District Court then decided that joint and several liability was appropriate given the "coordinated effort" of the underlying action. Id. at 380 n.14 (internal quotation marks omitted). The District Court indicated that the appellants could seek reconsideration or modification of the sanctions if any of them believed that the sanctions should be apportioned differently or if they believed that their financial resources should be considered in such an inquiry. See id.
 
 
 28
 The appellants filed a timely notice of appeal.
 
 DISCUSSION
 
 29
 The appellants' challenge consists of three basic arguments. First, they contend that the District Court lacked jurisdiction to impose sanctions. Second, they contend that the procedures followed by the District Court were inadequate to provide them with due process. Last, they contend that the District Court's substantive decision was based on an erroneous view of the law or on a clearly erroneous assessment of the facts. Although we conclude that the District Court did have jurisdiction to impose sanctions and afforded the appellants' adequate procedural safeguards, we ultimately conclude that the District Court based its substantive decision on a clearly erroneous assessment of the facts and, therefore, exceeded its allowable discretion. We shall address each argument seriatim.
 
 I. Jurisdiction
 
 30
 The appellants first contend that the District Court lacked jurisdiction to impose sanctions because it did so only after we had issued our mandate affirming the District Court's grant of judgment as a matter of law in Schlaifer IV, 119 F.3d 91 (2d Cir. 1997). Relying on Overnite Transp. Co. v. Chicago Indus. Tire Co., 697 F.2d 789 (7th Cir. 1983), they argue that once we issued our mandate, this case became closed for all purposes and the Estate could no longer seek sanctions from the District Court because no case or controversy existed through which the District Court could exercise jurisdiction over a sanctions motion. This claim is meritless.
 
 
 31
 The District Court clearly had jurisdiction to impose sanctions irrespective of the status of the underlying case because the imposition of sanctions is an issue collateral to and independent from the underlying case. See Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 395-96 (1990) ("a federal court may consider collateral issues after an action is no longer pending," including motions for costs, attorney's fees, contempt sanctions, and Rule 11 sanctions because they are "not a judgment on the merits of an action"); see also Willy v. Coastal Corp., 503 U.S. 131, 137-39 (1992); Chemiakin v. Yefimov, 932 F.2d 124, 127 (2d Cir. 1991); cf. Valley Disposal, Inc. v. Central Vermont Solid Waste Management Dist., 71 F.3d 1053, 1056 (2d Cir. 1995) (addressing motion for attorney's fees after voluntary dismissal of underlying case). Thus, even when a district court lacks subject matter jurisdiction over an underlying action, it still possesses jurisdiction to impose sanctions arising from the underlying case. See, e.g., Willy, 503 U.S. at 137-39 (addressing sanctions under Rule 11); Chemiakin, 932 F.2d at 127 (same). The fact that we had issued our mandate in this case prior to the motion for sanctions, therefore, did not deprive the District Court of its jurisdiction to impose sanctions.
 
 
 32
 Since the District Court had jurisdiction to impose sanctions, we shall proceed to consider the merits of the appeal.
 
 II. The Standard of Review
 
 33
 We review all aspects of a District Court's decision to impose sanctions for abuse of discretion. See Perry v. Ethan Allen, Inc., 115 F.3d 143, 154 (2d Cir. 1997) (addressing sanctions under Rule 11, 1927, and inherent power); United States v. Merritt Meridian Constr. Corp., 95 F.3d 153, 171 (2d Cir. 1996) (same); see also Chambers v. NASCO, Inc., 501 U.S. 32, 50 (1991) (addressing sanctions under inherent power); Cooter & Gell, 496 U.S. at 405 (addressing sanctions under Rule 11); Ted Lapidus, S.A. v. Vann, 112 F.3d 91, 96 (2d Cir.) (addressing sanctions under 28 U.S.C. 1927), cert. denied, 118 S. Ct. 337 (1997). "A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." Cooter & Gell, 496 U.S. at 405; accord Nuwesra v. Merrill Lynch, Fenner & Smith, Inc., 174 F.3d 87, 92 (2d Cir. 1999) (per curiam).
 
 
 34
 This abuse of discretion standard, however, is not as simple as it may appear at first blush. We have noted that this deferential standard gives "recognition to the premise that 'the district court is better situated than the court of appeals to marshal the pertinent facts and apply the fact-dependent legal standard' that informs its determination as to whether sanctions are warranted." Sussman v. Bank of Israel, 56 F.3d 450, 456 (2d Cir.) (quoting Cooter & Gell, 496 U.S. at 402), cert. denied, 516 U.S. 916 (1995). However, we have also recognized that
 
 
 35
 [a] troublesome aspect of a trial court's power to impose sanctions, either as a result of a finding of contempt, pursuant to the court's inherent power, or under a variety of rules ... is that the trial court may act as accuser, fact finder and sentencing judge, not subject to restrictions of any procedural code and at times not limited by any rule of law governing the severity of sanctions that may be imposed.
 
 
 36
 Mackler Prods., Inc. v. Cohen, 146 F.3d 126, 128 (2d Cir. 1998).
 
 
 37
 Thus, prior decisions caution that although the decision to impose sanctions is uniquely within the province of a district court, we nevertheless need to ensure that any such decision is made with restraint and discretion. See Chambers, 501 U.S. at 44 ("Because of their very potency, inherent powers must be exercised with restraint and discretion."); see also DLC Management Corp. v. Town of Hyde Park, 163 F.3d 124, 136 (1998) (same). Guided by these principles, we now turn to the appellants' arguments, addressing first their challenge to the procedures employed by the District Court.
 
 III. Procedural Challenge
 
 38
 "'[D]ue process requires that courts provide notice and opportunity to be heard before imposing any kind of sanctions.'" Ted Lapidus, S.A., 112 F.3d at 96 (quoting In re Ames Dep't Stores, Inc., 76 F.3d 66, 70 (2d Cir. 1996)). More specifically, we have held that
 
 
 39
 [a]n attorney whom the court proposes to sanction must receive specific notice of the conduct alleged to be sanctionable and the standard by which that conduct will be assessed, and an opportunity to be heard on that matter, and must be forewarned of the authority under which sanctions are being considered, and given a chance to defend himself against specific charges.
 
 
 40
 Sakon v. Andreo, 119 F.3d 109, 114 (2d Cir. 1997) (internal quotation marks omitted). We see no reason to afford a party different procedural safeguards than those afforded to an attorney. Thus, the initial inquiry before us is whether the District Court provided the appellants with adequate notice and an opportunity to be heard.
 
 A. Notice
 
 41
 At a minimum, the notice requirement mandates that the subject of a sanctions motion be informed of: (1) the source of authority for the sanctions being considered; and (2) the specific conduct or omission for which the sanctions are being considered so that the subject of the sanctions motion can prepare a defense. See Sakon, 119 F.3d at 114; Ted Lapidus, S.A., 112 F.3d at 96. Indeed, only conduct explicitly referred to in the instrument providing notice is sanctionable. See, e.g., Ametex Fabrics, Inc. v. Just In Materials, Inc., 140 F.3d 101, 109 (2d Cir. 1998). The appellants contend that the notice they received was inadequate to apprise them of the jeopardy they faced. They take particular issue with the fact that the Estate's motion was almost entirely devoted to arguing for sanctions under Rule 11, when the ultimate bases for the sanctions were the District Court's inherent power and 28 U.S.C. 1927.
 
 
 42
 We conclude, however, that the notice given, in its totality, was sufficient in this case. Although the Estate's motion focused chiefly on Rule 11 as the basis for sanctions, the motion also invoked and set forth the standards for sanctions under the District Court's inherent power and 28 U.S.C. 1927 as well. Thus, the Estate's motion cannot be said to have failed to give the appellants notice of the source of authority for the requested sanctions. In addition, the motion set out in detail the conduct alleged to have been sanctionable, including the prosecution of a meritless fraud claim despite the appellants' knowledge of the lack of reasonable reliance and the use of certain alleged heavy-handed tactics during discovery and the trial. Thus, the conduct on which the sanctions were based was presented in the motion as well. Furthermore, in its November 11, 1997 order setting forth its "preliminary thoughts," the District Court specifically stated that Rule 11 was inapplicable but that it would consider sanctions under 1927 and its inherent power, commendably focusing the issues for the appellants so that they would not have to address irrelevant claims. We therefore conclude that the appellants were afforded adequate notice.
 
 B. Opportunity To Be Heard
 
 43
 In addition to notice, the subject of a motion for sanctions is also entitled to an opportunity to be heard. See Sakon, 119 F.3d at 114; Ted Lapidus, 112 F.3d at 97. The appellants contend that by denying their request for a hearing, the District Court denied them the opportunity to be heard.
 
 
 44
 We have held that the opportunity to be heard does not necessarily entitle the subject of a motion for sanctions to an evidentiary hearing. See Oliveri v. Thompson, 803 F.2d 1265, 1280 (2d Cir. 1986), cert. denied, 480 U.S. 918 (1987); see also Chemiakin, 932 F.2d at 130 ("Although appellants attempt to engraft onto Rule 11 a requirement that an evidentiary hearing be held prior to the imposition of sanctions, there is no such requirement, absent disputed facts or issues of credibility, here as in the ordinary case."); International Shipping Co., S.A. v. Hydra Offshore, Inc., 875 F.2d 388, 392 (2d Cir.) ("[W]e have previously rejected the notion that the imposition of sanctions pursuant to Rule 11 requires an evidentiary hearing."), cert. denied, 493 U.S. 1003 (1989). There is, however, a difference between an evidentiary hearing and a hearing at which a subject is allowed to present oral argument. See Grievance Comm. for the E. Dist. of N.Y. v. Jacobs, 44 F.3d 84, 90 (2d Cir. 1994) (addressing procedures required for suspension of an attorney and noting that "[a] simple hearing, at which an attorney sets out arguments in his defense, is not the same as a full evidentiary hearing, at which an attorney may elicit testimony and other factual support for his defense"), cert. denied, 516 U.S. 817 (1995). An evidentiary hearing serves as a forum for finding facts; as such, its need can be obviated when there is no disputed question of fact or when sanctions are based entirely on an established record. In contrast, a hearing at which the subject of a sanctions motion speaks and argues vindicates a purpose that is sui generis. It is this latter purpose to which the phrase "opportunity to be heard" aspires in our context. Sanctions carry much more than a pecuniary impact: Reputations are at stake and licenses to practice are in danger. Thus, irrespective of the state of the factual record, a district court will often exercise its discretion to provide someone facing this jeopardy the opportunity to speak to the very court that is about to pronounce judgment.
 
 
 45
 Nevertheless, we cannot say that the District Court violated due process by denying the appellants' request for a hearing. We note that the appellants did not request a hearing until they submitted responses to the District Court's May 28, 1998 order, months after the last brief had been filed and well after the Estate had first moved for sanctions in October of the previous year. In addition, the District Court's decision was based on well-known facts contained in the existing record. Most significantly, after the District Court had narrowed the issues in its November 11, 1997 order, the appellants submitted extensive written responses to the Estate's motion. We have acknowledged that the opportunity to submit written briefs may be sufficient to provide an opportunity to be heard. See, e.g., International Ore & Fertilizer Corp. v. SGS Control Servs., Inc., 38 F.3d 1279, 1286 (2d Cir. 1994) ("Appellants ... had notice from [the appellee's Rule 11 sanctions] motion, and an opportunity to be heard by opposing the motion in the affidavit submitted."), cert. denied, 515 U.S. 1122 (1995). Thus, although granting a hearing for oral argument would generally be the better practice, we cannot say that under the circumstances before us, the denial of a hearing was a denial of an opportunity to be heard.
 
 
 46
 We therefore conclude that the appellants were afforded both adequate notice and an opportunity to be heard, thus meeting the requirements of due process. We now consider the appellants' challenge to the District Court's substantive decision.
 
 IV. Substantive Challenge
 
 47
 As we noted previously, the District Court imposed sanctions on the appellants pursuant to its inherent power and to 28 U.S.C. 1927. A district court's inherent power to sanction derives from the fact that courts are "vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." Chambers, 501 U.S. at 43 (internal quotation marks omitted); accord DLC Management Corp., 163 F.3d at 136. In order to impose sanctions pursuant to its inherent power, a district court must find that: (1) the challenged claim was without a colorable basis and (2) the claim was brought in bad faith, i.e., motivated by improper purposes such as harassment or delay. See Milltex Indus. Corp. v. Jacquard Lace Co., 55 F.3d 34, 38 (2d Cir. 1995); see also Oliveri, 803 F.2d at 1272 ("[B]ad faith may be found, not only in the actions that led to the lawsuit, but also in the conduct of the litigation.") (citation and internal quotation marks omitted).
 
 
 48
 Title 28, section 1927 of the United States Code, in turn, provides that a court may impose sanctions on any attorney who "so multiplies the proceedings in any case unreasonably and vexatiously." Section 1927 authorizes the imposition of sanctions when "there is a clear showing of bad faith on the part of an attorney." Shafii v. British Airways, PLC, 83 F.3d 566, 571 (2d Cir. 1996); accord Oliveri, 803 F.2d at 1273. As with sanctions imposed pursuant to a court's inherent power, in the 1927 context, bad faith may be inferred "only if actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay." Shafii, 83 F.3d at 571 (internal quotation marks omitted). Thus, in practice, "the only meaningful difference between an award made under 1927 and one made pursuant to the court's inherent power is ... that awards under 1927 are made only against attorneys or other persons authorized to practice before the courts while an award made under the court's inherent power may be made against an attorney, a party, or both." Oliveri, 803 F.2d at 1273. Our analysis, therefore, shall focus on the propriety of the District Court's findings as to colorability and bad faith.
 
 
 49
 Turning to these two elements, we conclude that the District Court relied on a clearly erroneous assessment of the facts in finding that SNC's claim was without a colorable basis and was pursued in bad faith. We are therefore compelled to reverse the order sanctioning the appellants.
 
 A. Colorability
 
 50
 Under New York law, in order to prevail on a fraud claim, a plaintiff must prove five elements by clear and convincing evidence: "(1) a material misrepresentation or omission of fact, (2) made with knowledge of its falsity, (3) with an intent to defraud, and (4) reasonable reliance on the part of the plaintiff, (5) that causes damage to the plaintiff." Schlaifer IV, 119 F.3d at 98. The only element at issue in the case before us is the fourth, reliance. As for this element,
 
 
 51
 if the plaintiff "has the means of knowing, by the exercise of ordinary intelligence, the truth, or the real quality of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations."
 
 
 52
 Id. (quoting Mallis v. Bankers Trust Co., 615 F.2d 68, 80-81 (2d Cir. 1980), cert. denied, 449 U.S. 1123 (1981)).
 
 
 53
 The District Court concluded that SNC's claim was without a colorable basis because it could not have reasonably relied on the Estate's representations since SNC and its attorneys knew, or had the means of knowing, that the representations were unreliable or false. See Schlaifer V, 7 F. Supp. 2d at 375. In support of this conclusion, the District Court relied on its prior decision granting judgment as a matter of law in which it found that: (1) Hughes's representations, by their own terms, were not as sweeping as SNC contended they were; (2) Roger Schlaifer had been told of the existence of a watch deal; (3) the plain meaning of the Agreement did not purport to guarantee the rights to all of Warhol's works; (4) the opinion letter from the pseudo-law firm vouching for the Estate's representations was patently unreliable and, in any event, was received after the Agreement was executed; (5) a 1985 book indicated that there were no copyrights to some of Warhol's works, and that third-parties owned the rights to other works; (6) SNC's attorneys were aware of the Estate's copyright problems and warned of them; (7) both Susan Nance Schlaifer and Roger Schlaifer were aware of the Estate's copyright problems; and (8) the Estate's efforts to limit its liability for continuing to provide copyright information indicated that its rights were not absolute. See Schlaifer III, 927 F. Supp. at 657-59.
 
 
 54
 Although we are convinced, and indeed, bound by our prior decision that these findings support the District Court's grant of judgment as a matter of law, we conclude that they cannot support the District Court's finding that SNC's fraud claim was without a colorable basis. "[A] claim is entirely without color when it lacks any legal or factual basis." Sierra Club v. United States Army Corps of Eng'rs, 776 F.2d 383, 390 (2d Cir. 1985) (internal quotation marks omitted) (emphasis added), cert. denied, 475 U.S. 1084 (1986). Conversely, a claim is colorable "when it has some legal and factual support, considered in light of the reasonable beliefs of the individual making the claim." Nemeroff v. Abelson, 620 F.2d 339, 348 (2d Cir. 1980) (per curiam). "The question is whether a reasonable attorney"-and for our immediate purposes, a reasonable plaintiff as well-"could have concluded that facts supporting the claim might be established, not whether such facts actually had been established." Id. Thus, as an initial matter, we note that a claim that fails as a matter of law is not necessarily lacking any basis at all. A claim is colorable when it reasonably might be successful, while a claim lacks a colorable basis when it is utterly devoid of a legal or factual basis. Accordingly, judgment as a matter of law against a claim is a necessary, but not a sufficient, condition for a finding of a total lack of a colorable basis. See, e.g., Perry v. Ethan Allen, Inc., 115 F.3d 143, 154 (2d Cir. 1997) (affirming the district court's denial of the defendant's motion for sanctions invoking Rule 11, 1927, and the court's inherent power, despite the district court's grant of judgment as a matter of law to the defendant).
 
 
 55
 Additionally, although certain facts in this case undercut the vitality of SNC's fraud claim, the facts in their totality belie the conclusion that SNC's claim lacked a colorable basis. For instance, Hughes's qualifications to SNC, read in the context of an on-going negotiation, can hardly be considered unequivocal warnings to SNC that the Estate did not own all of the copyrights to Warhol's works. Rather, these particular facts merely indicate, to use the exact words of SNC's attorneys, "concerns" and "potential problems." "Concerns" and "potential problems," however, pervade every transaction and are characteristic of every litigation. Their mere existence, therefore, does not render SNC's reliance on the Estate's representations so utterly unreasonable that SNC's fraud claim was totally devoid of a colorable basis. Rather, even with its awareness of these "concerns," the appellants still had some basis to present SNC's claim in court.
 
 
 56
 We note also that the opinion letter issued by the pseudo-law firm vouching for the bona fides of the Estate's copyrights also provides some support for SNC's reliance. Although the letter itself could not have been reasonably relied upon because it was received after the execution of the Agreement, the Estate had promised to submit it to SNC prior to execution of the Agreement. Thus, the reassurance provided by the Estate's promise bolsters the reasonability of SNC's reliance. Indeed, the significance of the Estate's promise takes on added significance in light of the advice given to SNC by its copyright expert. Although the expert advised that SNC should pursue an independent investigation, he also indicated that the Estate was in a better position than SNC to assess the status of the copyrights to Warhol's works since the necessary and relevant documents were maintained by the Estate, see Schlaifer IV, 119 F.3d at 99, and that information concerning the copyright status to Warhol's works was "in the special knowledge of the Andy Warhol business representatives." Id. Thus, not only did this advice provide a colorable basis for SNC's reliance on the Estate's representations, it also magnified the reassurance that the promise of the opinion letter represented. In light of these considerations, SNC's faith in the Estate's representations was not entirely inexplicable.
 
 
 57
 Moreover, the jury's verdict in favor of SNC also speaks against the District Court's finding of the absence of colorability-the attorneys were not the only ones who found SNC's claim convincing. Further, the District Court's view in granting judgment as a matter of law, as well as our affirmance thereof, are the result of detached judicial analysis that, made with the benefit of hindsight after all the evidence had been presented at trial, cannot be equated with the advocate's considerations prior to and during the trial. Although we do not hold that a jury verdict in the plaintiff's favor automatically precludes a finding that the claim lacked a colorable basis, we nevertheless conclude that in this case the jury verdict, notwithstanding the fact that reliance was held to be unreasonable as a matter of law, at least indicates that the attorneys were not unrealistic in anticipating that SNC's testimony as to its reliance would be viewed by objective jurors as credible.
 
 
 58
 We conclude that the facts in this case were sufficient to allow the appellants reasonably to believe that they could have established their fraud claim. We are therefore compelled to conclude that the District Court relied on a clearly erroneous assessment of the facts in finding that SNC's fraud claim lacked a colorable basis.
 
 B. Bad Faith
 
 59
 The second requirement for sanctions under a court's inherent power and 1927 is bad faith. Bad faith can be inferred when the actions taken are "so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose." People of the State of New York v. Operation Rescue Nat'l, 80 F.3d 64, 72 (2d Cir.) (addressing sanctions under 1927) (internal quotation marks omitted), cert. denied, 519 U.S. 825 (1996). "[T]he court's factual findings of bad faith must be characterized by a high degree of specificity." Milltex, 55 F.3d at 38 (internal quotation marks omitted). Consistent with this requirement, the District Court presented seven factors on which it based its finding of the appellants' bad faith: 1. SNC's position as to reasonable reliance was "patently frivolous," Schlaifer V, 7 F. Supp. 2d at 376;
 
 
 60
 2. SNC's own documents and witnesses suggested that SNC could not have believed the Estate's representations to be true, see id. at 376-77;
 
 
 61
 3. SNC's attorneys permitted Roger Schlaifer to testify as he did despite the fact that he had previously given contradictory testimony in a prior proceeding, see id. at 377;
 
 
 62
 4. SNC's attorneys ran up $2.6 million in fees pursuing a claim that had a maximum compensatory damages value of $63,941, see id.;
 
 
 63
 5. SNC had already won $4 million from an arbitral panel, including $1.5 million in punitive damages, yet still pursued the instant claim, see id.;
 
 
 64
 6. SNC's attorneys, by December of 1991, shifted to a contingency fee arrangement with SNC, a change which the District Court interpreted to be motivated by the desire to press on with the litigation despite its small value in the hope of "rack[ing] up" legal fees and recovering these fees as part of a punitive damages award, id.; and
 
 
 65
 7. SNC's attorneys litigated this case with an "unreasonable tenacity," including issuing onerous subpoenas to two witnesses (later curbed by the District Court), deposing Hughes's doctor when Hughes claimed to be unavailable due to illness, and seeking to introduce a video and photographs of Hughes at trial "because they thought he would come across to the jury as an evil person." Id. at 378.
 
 
 66
 We conclude that these factors cannot support a finding of bad faith in this case. First, the three factors concerning attorney's fees (factors four, five, and six) are of limited relevance. SNC's action once presented both a civil RICO claim as well as a fraud claim. Thus, the potential value of SNC's entire action, at least in its early stages, was quite high. Indeed, the compensatory damages recoverable on SNC's fraud claim were not capped at $63,941 until well into the action. See Schlaifer IV, 119 F.3d at 96. Further, SNC was seeking punitive damages in connection with its fraud claim; that the jury ultimately found that SNC should recover $1 million in such damages against each of the three individual defendants suggests that SNC and its attorneys could reasonably believe that SNC might win a sizeable award by prosecuting its action. Thus, the purported disproportionality between the fees spent and the ultimate value of SNC's claim is somewhat exaggerated, if not inaccurate.
 
 
 67
 In addition, the fact that the appellants switched to a contingency fee arrangement in December 1991 cannot be said to manifest an intent to "rack up" legal fees in a case in which the claim allegedly had a low value. Contingency fee arrangements-of various forms and common in today's practice context-enable a cash-poor or shrewd client to prosecute an action by shifting the risk of non-recovery to the attorney. The attorney's incentive to accept the risk in such an arrangement is the fact that there is a reasonable prospect that the recovery will be large. Thus, in this case, if anything, the transition to a contingency fee arrangement actually indicates the attorneys' subjective view that SNC's claim was likely to produce a large recovery for SNC that would sufficiently compensate them for their fees and their risk in taking the case.
 
 
 68
 In this context, although we harbor no illusions about pecuniary gain as a motivation for legal actions, it would be unduly cynical to conclude categorically that the pursuit of a relatively low-value claim necessarily implies some sort of bad faith. Vindication, or the prospect of winning punitive damages, are legitimate motives for bringing a legal action. Although we do not now preclude the use of disproportionate fees as one indicator of bad faith where there is additional explicit and objective evidence indicating that an action was prosecuted simply for attorney's fees, we conclude that the fees and fee arrangement in this case are simply not probative of bad faith.
 
 
 69
 Also erroneous are the inferences drawn from the factors dealing with the conduct of SNC's attorneys (factors three and seven). First, with respect to the subpoenas, we do not believe that the appellants crossed the line from hard-nosed lawyering to harassment. Seeking to have a witness subject to a subpoena for an extended period of time may be belligerent, but it can hardly be said to be malicious. There is no indication, after all, that the witnesses were not relevant to the proceedings. Thus, we decline to infer bad faith simply from the issuance of subpoenas that were later deemed unduly onerous.
 
 
 70
 Second, although deposing a witness's doctor to confirm the witness's unavailability for medical reasons may appear somewhat extreme, this effort to confirm a medical excuse cannot be characterized as so improper as to indicate bad faith. This deposition at most supports the inference that the appellants were distrustful and combative, which, regrettably, attorneys and parties become when a suit deteriorates to the level this one did.
 
 
 71
 Third, seeking the admission of video and photographs of a witness is hardly unusual. Although to seek the admission of this evidence solely so that the witness is made to appear "evil" may cross the line, there is nothing in the record that evinces this purpose. On the contrary, attacking a witness's demeanor, if relevant, is a fully acceptable and expected litigation tactic. If the means chosen to do so lies beyond the pale, then a district court should certainly put a stop to it-as the District Court did here. However, we cannot conclude that the appellants in this case should be sanctioned for being aggressive on this point.
 
 
 72
 Fourth, although Roger Schlaifer's testimony in the trial below and in the April 1988 proceeding was inconsistent, we cannot agree that its use evidenced bad faith. There was evidence supporting Roger Schlaifer's trial testimony-e.g., the opinion letter from a law firm putatively representing the Estate, the advice of SNC's copyright expert, and the conceded misrepresentations of the Estate-which, although objectively unreliable, certainly shaped the appellants' subjective intent underlying their decision to use Roger Schlaifer's testimony. Thus, although improvident, the use of Roger Schlaifer's testimony cannot be characterized as deceptive absent additional evidence indicating that the testimony's inconsistencies were intentional lies and that the appellants were aware of this. Indeed, we note that the District Court found that SNC's attorneys "conducted themselves, for the most part, in a professional manner." Schlaifer V, 7 F. Supp. 2d at 378.
 
 
 73
 Finally, with respect to the first two factors cited by the District Court, although the District Court concluded that SNC's claim was objectively frivolous and that SNC's own documents and witnesses indicated so, we cannot conclude that the continuation of SNC's action was anything more than the result of poor legal judgment. Quite clearly, the appellants should have known that the Estate's representations were flawed. Nevertheless, there is no evidence to suggest that they had utterly no basis for their subjective belief in the merits of their case. On the contrary, it is clear that the Estate's conceded misrepresentations, bolstered by the advice of SNC's expert, had the effect of assuaging SNC's copyright concerns. Thus, the record actually indicates that the appellants did indeed possess some concrete grounding for their belief that their fraud claim had a colorable basis for assertion and litigation. Cf. Simon DeBartolo Group, L.P. v. Richard E. Jacobs Group, Inc., 186 F.3d 157, 166 (2d Cir. 1999) (noting that Rule 11 intended to preclude "emptyhead pureheart" justification for patently frivolous suits). Given these bases for the appellants' subjective good faith in SNC's action, and in the absence of any other evidence indicating an absence of a genuine belief in the validity of the action, we conclude that the record cannot support an inference of bad faith on the part of the appellants. We therefore hold that the District Court relied on a clearly erroneous assessment of the facts in finding that the appellants acted in bad faith.
 
 
 74
 As a final point, we note that it is indisputable that the Estate did indeed engage in some rather outrageous, if not outright deceptive, conduct in securing the Agreement with SNC. Although, in light of our disposition of this appeal, we need not address whether such unclean hands may preclude the imposition of sanctions, we observe that a court considering sanctions can and should consider the equities involved before rendering a decision.
 
 CONCLUSION
 
 75
 We are cognizant of the unique dilemma that sanctions present. On the one hand, a court should discipline those who harass their opponents and waste judicial resources by abusing the legal process. On the other hand, in our adversarial system, we expect a litigant and his or her attorney to pursue a claim zealously within the boundaries of the law and ethical rules. Given these interests, determining whether a case or conduct falls beyond the pale is perhaps one of the most difficult and unenviable tasks for a court.
 
 
 76
 We hold that the District Court had jurisdiction to impose sanctions on the appellants. In addition, we hold that the District Court provided adequate process to the appellants before deciding to impose sanctions. However, we also hold that the District Court's decision to impose sanctions pursuant to its inherent power and to 28 U.S.C. 1927 was premised on a clearly erroneous assessment of the facts. The record cannot support the District Court's findings that SNC's fraud claim was completely without a colorable basis and that the appellants continued to pursue their action in bad faith. Accordingly, we are compelled to reverse its imposition of sanctions. Each party shall bear its own costs on this appeal.