FOUR STAR FINANCIAL SERVICES, LLC., Plaintiff,

v.

COMMONWEALTH MANAGEMENT ASSOCIATES, Brite Business Corporation, Charles Sullivan, Individually, Martin D. Fife, Individually, Raymond James Financial Services, Inc., Dennis S. Herula, Individually, and John Doe 1–20, Defendants.

No. 01 Civ. 1276(JSM).

United States District Court, S.D. New York.

April 17, 2001.

**806**

James D. Fornari, Traub, Bonacquist & Fox LLC, New York City, for Plaintiff.

Donald S. Zakarin, Pryor Cashman Sherman & Flynn LLP, W. Hans Kolselt, Pollack & Kaminsky, Morris K. Mitrani, New York City, for Defendants.

## MEMORANDUM OPINION AND ORDER

MARTIN, District Judge.

In January 2000, Four Star Financial Services LLC, ("Plaintiff") invested $11,750,000 in an investment program that was to be managed by the Defendant Martin D. Fife ("Fife"). The following July, $7,000,000 was returned to Plaintiff by the Defendants. Between November 2000 and the end of January 2001, Defendant Fife repaid Plaintiff an additional $2,600,000.

On February 22, 2001, Plaintiff filed an *ex parte* application for a writ of attachment based on a Verified Complaint that stated: "Defendants are indebted to the Plaintiff in the amount of at least $11,500,000, plus interest and profits in an amount represented by Defendants to be in excess of $7,000,000." (Compl.¶ 33.) To its great regret and embarrassment, the Court granted Plaintiff's application for a writ of attachment directed to each Defendant in the amount of $11,500,000.

The question that naturally arises is: "How could the Court grant Plaintiff a writ of attachment in the amount of $11,500,000 when the Plaintiff had made an investment of only $11,750,000 and $9,600,000 had already been returned?" The answer is that the papers in support of the application were false and misleading.

Not only did the Verified Complaint fail to mention the $9,600,000 that had been repaid to Plaintiff, but it conveyed the impression that there had been no repayment despite repeated assurances that the invested money would be returned. Indeed, paragraph thirty-two of the Verified Complaint contains the false statement: "No funds have been received by Plaintiff." (Compl.¶ 32.)

The Verified Complaint was also totally misleading in its attempt to convey a factual predicate for the allegation that the Defendants were about "to attempt to abscond with the funds identified above with the intent to defraud Plaintiff." (Compl.¶ 5.) In this regard, the Verified Complaint conveyed a picture of Defendants as itinerant swindlers without roots in New York who continuously promised to return Plaintiff's investment but never made any of the promised payments.

In support of the claim that Defendant Fife was about to abscond with its funds, the Verified Complaint stated: "Fife has no real estate or permanent residence in his name within the State of New York." (Compl.¶ 11.) While this statement might be literally true, Plaintiff's general counsel, who swore to the Verified Complaint, knew that Fife lived with his wife, a former Deputy Mayor of the City of New York,[1] in

---

1. At argument on the issue of sanctions, Plaintiff's general counsel contended that the Court seemed overly impressed with the fact that Defendant Fife's wife was a former Deputy Mayor, a fact that was not relevant to the

question of whether her husband had committed a fraud. The Court agrees that his wife's former position as Deputy Mayor does not make it any more or less likely that Fife

an apartment on Central Park West which was held in her name. The Verified Complaint also made no mention of Fife's membership on the Boards of the Dreyfus Fund Incorporated and several of its affiliated funds.

The Court did not learn that Plaintiff and its counsel had mislead it into granting an unwarranted writ of attachment until it received motions from Defendants Fife and Sullivan seeking to vacate the attachment. After hearing argument from the parties, the Court granted the motions to vacate the attachment, invited Defendants to submit an application for attorneys' fees against the bond, and directed Plaintiff's counsel and its general counsel to show cause why they should not be sanctioned under Rule 11 of the Federal Rules of Civil Procedure and why the Court should not refer their conduct to the appropriate bar associations. (Hereinafter, Plaintiff's attorney in this action and its general counsel will be collectively referred to as Respondents.)

At a subsequent hearing, the Court granted the applications of defense counsel to recover against the bond fees and expenses totaling $70,513.53, but reserved decision on the question of Rule 11 sanctions.

## DISCUSSION

### A. *The Rule 11 Standard*

In considering the issue of sanctions in this case, it is appropriate to start with the observation of Judge Pratt in *Oliveri v. Thompson,* 803 F.2d 1265, 1267 (2d Cir. 1986):

> Most lawyers who litigate in our federal courts perform their function at a commendable level of professionalism, advancing claims and defenses with the zeal of a trained advocate, but properly

tempering enthusiasm for a client's cause with careful regard for the obligations of truth, candor, accuracy, and professional judgment that are expected of them as officers of the court. Because, we suppose, in a system as large and diverse as our federal court system, it is inevitable that a few attorneys will occasionally fall short in these professional obligations, sanctions against attorneys play a limited but necessary role in the administration of our civil justice system. Severe forms of misconduct have traditionally been subject to contempt citations, review by bar association grievance committees, and in extreme cases, suspension or disbarment. In recent years, however, increasing attention has been focused upon lesser sanctions as a means of fine-tuning our litigation system to weed out some of its abuses and to improve its dispute-resolving function.

In their response to the Order to Show Cause, Respondents admit that the Verified Complaint contains misstatements of fact and acknowledge an understanding of why the Court would consider it misleading and be upset by their conduct. They contend, however, that they acted in good faith on the belief that they had been defrauded by Defendants, and that Defendants had told them that they were moving their assets offshore to prevent Plaintiff from collecting any judgment that it might obtain.

Even accepting Respondents' assertion that they did not deliberately set out to mislead the Court and that any errors in their papers resulted from the time pressures involved in preparing an application for emergency relief, subjective good faith is not a defense. Rule 11 sanc-

would commit a fraud. However, it is highly relevant in considering Fife's roots in this

community and the likelihood that he would "abscond" if his assets were not attached.

tions are judged under an objective reasonableness standard. *See Lapidus v. Vann,* 112 F.3d 91, 96 (2d Cir.1997); *Int'l Telepassport Corp. v. USFI, Inc.,* 89 F.3d 82, 86 (2d Cir.1996); *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.,* 61 F.3d 123, 131 (2d Cir.1995). Indeed, in *United States v. International Brotherhood of Teamsters,* 948 F.2d 1338 (2d Cir.1991), Judge McLaughlin noted: "In deciding whether the signer of a pleading, motion, or other paper has crossed the line between zealous advocacy and plain pettifoggery, the court applies an objective standard of reasonableness." *Id.* at 1344.

■ In so far as is relevant here, Rule 11 provides:

> By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,—
>
> .    .    .    .    .
>
> (2) *the claims, defenses, and other legal contentions therein are warranted* by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;
>
> (3) *the allegations and other factual contentions have evidentiary support* or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery....

Fed.R.Civ.P. 11(b) (emphasis added).

Plaintiff's counsel submitted to the Court an application for a writ of attachment seeking to attach the assets of each of the Defendants[2] "as will satisfy $11,500,000.00 the amount of Plaintiff's demand...." (Mot. Short Notice.) This was based on the allegation in the Verified Complaint, signed by Plaintiff's general counsel, that: "Defendants are indebted to the Plaintiff in the amount of at least $11,500,000.00, plus interest and profits in an amount represented by Defendants to be in excess of $7,000,000.00...." (Comp. ¶ 33.)

When pressed by the Court as to how they could state in the Verified Complaint that Defendants were indebted to Plaintiff in the amount of $11,500,000 plus interest and profits when $9,600,000 of the original investment of $11,750,000 had been returned to Plaintiff by the time the Verified Complaint was prepared, Respondents offered the following strained explanation.

According to Plaintiff's general counsel, less than three months after the initial investment of $11,750,000 was made, he was told that the investment had already earned $4,000,000, and Respondents considered this to be reinvested money. In addition, Defendant Sullivan had promised to pay Plaintiff $5,500,000, and Defendant Fife, who had already repaid $9,600,000, had promised to pay Plaintiff an additional $2,000,000. Thus, by adding the $4,000,000 profit earned in the first three months, the $5,500,000 that Sullivan had agreed to repay, and the additional $2,000,000 promised by Fife, Respondents claim that there was a total indebtedness of $11,500,000.

Among the problems with this response are the following: 1) the Verified Complaint contains no allegation that Plaintiff earned a profit of $4,000,000 in three months that was reinvested, and 2) while Fife and Sullivan may have individually promised to repay Plaintiff the original

---

**2.** The application excluded the one named defendant whom Plaintiff identified as having an office in New York.

investment, combining these amounts as an amount owed by each of them was double-counting.

Even giving Respondents the benefit of the doubt that the $4,000,000 alleged profit could be added to the original investment of $11,750,000 and thus considered part of the principal,[3] in light of the repayment of $9,600,000, the most that Plaintiff could have properly alleged as the amount of the outstanding indebtedness was $6,150,000.

Thus, it was not objectively reasonable for Respondents to file a Verified Complaint alleging that Defendants were indebted to Plaintiff in the amount of $11,500,000 plus interest and profits, or to seek a writ of attachment for that amount as to each Defendant. It was also objectively unreasonable for Plaintiff to seek a writ of attachment in the amount of $11,500,000 against Defendant Fife who had already been responsible for the return to Plaintiff of $9,600,000 of the original investment. Moreover, the problem with seeking such an attachment against Fife is exacerbated by the misleading allegations in the Verified Complaint that he was about "to abscond" and that he had "no ... permanent residence in his name within the State of New York." (Compl. ¶ 11.)

■ Rule 11 does not explicitly prohibit failing to set forth facts necessary to prevent the facts that are stated in a filing from misleading the Court. However, the requirement that the facts alleged have "evidentiary support" requires, at a minimum, that there is reason to believe that, when all the facts are known, the Court will find that they support the relief requested. Here, no reasonable attorney could believe that a Judge would issue an *ex parte* order of attachment against Fife

in the amount of $11,500,000 if informed that Fife resided in an apartment in New York City which was owned by his wife and that he had been responsible for returning $9,600,000 of Plaintiff's original investment.

### B. *The Sanctions to be Imposed*

■ Having found that Respondents' conduct violated Rule 11, the Court must determine the sanctions to be imposed. Rule 11 gives a court "significant discretion in determining what sanction, if any, should be imposed for a violation...." Fed.R.Civ.P. 11(c) (Advisory Committee Note). The sanction "should not be more severe than necessary to deter repetition of the conduct by the offending person or comparable conduct by similarly situated persons." *Id.; see Margo v. Weiss,* 213 F.3d 55, 64 (2d Cir.2000); *Schlaifer Nance & Co. v. Estate of Warhol,* 194 F.3d 323, 333 (2d Cir.1999); *Benton v. G & O Mfg. Co.,* 921 F.Supp. 905, 908 (D.Conn.1995).

In this case, Respondents have vigorously asserted that they acted in good faith and did not intend to mislead the Court. While a cold review of the facts gives reason to be skeptical of that assertion, this Court is not willing to stigmatize two attorneys, who apparently have unblemished reputations, by making a finding that is contrary to their sworn assertions of good faith. For that reason, the Court has not referred to Respondents by name in this Opinion.

However, as noted above, good faith is not the issue. As Judge Pratt noted in *Oliveri v. Thompson,* one of the purposes of Rule 11 is to provide sanctions less severe than those previously available to punish wilful misconduct "as a means of fine-tuning our litigation system to weed

---

**3.** Of course, the Court would never have authorized a writ of attachment to recover a

33% profit allegedly earned in three months.

out some of its abuses and to improve its dispute-resolving function." *Oliveri*, 803 F.2d at 1267.

Even accepting Respondents assertions that they acted in good faith, their objectively unreasonable conduct violated Rule 11. The Court must exercise its discretion to order a sanction, not merely to deter these Respondents from engaging in similar conduct in the future but, as noted above, "to deter ... comparable conduct by similarly situated persons." Fed. R.Civ.P. 11(c) (Advisory Committee Note).

In considering the appropriate sanction to be applied in this case, it is important to recognize that we are not dealing simply with the allegations of an unverified complaint filed simply to commence contested litigation. The false and misleading assertions in this case were contained in a Verified Complaint which was the basis for an *ex parte* application for the extraordinary remedy of a writ of attachment. Because in making the application for a writ of attachment Respondents knew that the Court would be required to place particular trust in the truth of the Verified Complaint's sworn statements, they had a heightened obligation to insure that the facts were accurately portrayed.

Sanctions must be imposed here to make it clear to all who practice in the federal courts that when they come before a Judge seeking extraordinary relief *ex parte*, they will be held to the highest standards of candor. It is not a defense to claim that, while factual statements to the Court were materially misleading, they were not literally false. Attorneys are officers of the Court, and our system of justice cannot operate efficiently if the Court cannot rely on the candor of counsel presenting an application for *ex parte* relief.

The Court is persuaded that, in responding to the Court's Order to Show Cause and being called to task by the Court for the false and misleading assertions in the Verified Complaint, Respondents have been sufficiently chastened so that it is unlikely that they will engage in similar conduct in the future. However, some additional sanction is necessary to insure that other attorneys will be deterred from submitting a similar application for *ex parte* relief which so grossly misleads the Court as to the merits of their claim

Therefore, each of Respondents is ordered to pay the amount of $2,500 to the Clerk of the Court as a sanction for the violation of Rule 11.

**SO ORDERED.**