MEMORANDUM & ORDER
 

 GLASSER, District Judge.
 

 This suit arises out of an oral lease agreement that Plaintiff, a movie theatre company, alleges it reached with a property owner to develop the property for a new theatre. The Court has three motions pending before it: (1) Plaintiffs motion for voluntary dismissal with prejudice pursuant to Fed.R.Civ.P. 41(a)(2); (2) Defendants’ cross-motion for summary judgment; and (3) Defendants’ cross-motion for sanctions.
 
 [1]
 

 STATEMENT OF FACTS
 

 The following material facts are undisputed and are set forth in the light most favorable to the non-moving party.
 
 [2]
 
 Plaintiff United Artists Theatre Circuit, Inc. (“Plaintiff,” “UA” or “UATC”) claims that in November 1996, it reached an oral agreement with defendant Sun Plaza Enterprise Corp. (“SPEC”), through its principal, Efraim Shurka (“Shurka”) (collectively, SPEC and Shurka are referred to as “Defendants”), for a 40-year lease, pursuant to which it would build, develop and manage a movie theatre at 5260 Avenue U in Brooklyn, New York (the “Project” or the “Site”). (Hirth Aff. Exh. A, attaching the complaint (“Compl.”) ¶ 1). As evidence of this alleged oral agreement, UA points to,
 
 inter alia,
 
 the following: (a) a November 19, 1996 memorandum sent from Robert Greenstone (“Greenstone”), a commercial real estate broker engaged by UA, to Shurka and Hal Cleveland (“Cleveland”), executive vice president of UA, stating that conversations between the parties have resulted in an “agreement in principal” with respect to, among other things, the rent, Greenstone Aff. Exh. 1; (b) Cleveland’s declaration in which he states that in “November 1996, Mr. Shur-ka and I reached a meeting of the minds on the major points of a deal for the development of a UA theater at the Avenue U site, which SPEC would lease to UA for $28 per square foot,” Cleveland Deck ¶ 4; (c) Greenstone’s affidavit which reflects UA’s understanding of the state of negotiations in November 1996 that an oral agreement for a lease had been reached which required further negotia
 
 *345
 
 tions only to the extent of documenting the oral agreement in writing, Greenstone Aff. ¶ 4; and (d) the allegation in paragraph 10 of the complaint which states that the parties “agreed to the material terms of’ a lease governing the Project in November 1996, Compl. ¶ 10.
 

 In particular, the November 19, 1996 memorandum (the “11/19/96 Memo”) from Greenstone to Shurka and Cleveland states “[sjhould your understanding” about the “agreement in principal” differ from the terms set forth in the memo, “please inform us a[t] once. Further, please inform your attorneys to resume their discussions of the legal issues and language of the lease.” (Greenstone Deck Exh. 1). The complaint alleged that, based upon the facts it advanced, an oral agreement was reached upon all the material terms of a lease.
 
 [3]
 
 (ComplJ 10). After the parties reached their November 1996 “agreement,” Shurka allegedly informed Cleveland that SPEC wanted UA’s board of directors to approve the project on or before February 14, 1997. (Cleveland Decl. ¶ 5; Shurka ¶ 44).
 

 Terrence Dunn (“Dunn”), UA’s outside real estate counsel, testified that following the November 1996 “agreement,” he “spent a significant amount of time revising a lease document” between the parties “as well as [addressing] additional non-material issues agreed upon between the parties.” (Dunn Aff. ¶ 4). Moreover, after reaching the “agreement” in November 1996, UA’s architect, Francis Corva, in reliance thereon, “designed and revised plans for the Avenue U project. Mr. Cor-va also worked closely with Mr. Shurka, and Mr. Corva’s design work was the basis for the Avenue U project.”
 
 (Id.;
 
 Compl. Exh. (attaching Mr. Corva’s architectural plans)). The site plan developed by Mr. Corva included not only UA’s “theatre space but also structural designs for space that would be rented by SPEC to others for retail stores.” (Comply 11). Thereafter, Shurka asked Mr. Corva to send him a computerized disk of the design plans.
 
 (Id.
 
 ¶ 14). “In reliance on Shurka’s representations that he needed the plans only to facilitate the execution of a lease reflecting the parties’ agreement — representations made at and prior to the time of the request — [UA] authorized Corva to forward the disk to Shurka.”
 
 (Id.).
 

 Shurka testified that he “always maintained the claim that” he had set forth a February 14, 1997 “deadline” for the parties to finalize and sign a written lease agreement for the Site. (Shurka Aff. ¶ 44). Therefore, according to Shurka, if UA did not conclude negotiations for a lease agreement and execute it on or before February 14, 1997, SPEC had every intention of engaging other companies to negotiate a lease agreement for the Project.
 
 (Id.).
 
 These facts are supported by a January 21, 1997 letter (the “1/21/97 Letter”) which Greenstone sent to Cleveland, in which he wrote that Shurka “agreed to give [UA] a month to obtain the go-ahead on the” Project “from UA’s Board of Directors.” (Shurka Aff. Exh. E). In that same letter, Greenstone wrote that UA needed to obtain the necessary approvals within three weeks, otherwise Shurka would pursue other partners for the Project.
 
 (Id.)
 

 Approximately two weeks later, Green-stone sent Cleveland a letter dated February 5,1997, in which he told Cleveland that his brokerage firm was “getting real nervous” about the Project, particularly with respect to obtaining board approval for it. (Shurka Aff. Exh. F). Cleveland then
 
 *346
 
 wrote a memo to Kurt Hall, UA’s president and chief executive officer, dated February 7, 1997 (the “2/7/97 Memo”), in which he stated that the Project “will ... be lost as of Friday, February 14, if the lease is not fully negotiated and signed. Efe Shurka, the Landlord, calls me on a daily basis.... If we cannot or will not move forward, we should simply tell the developers the truth and allow them to go in a different direction.” (Shurka Aff. Exh. G).
 

 The lease agreement was not executed on or before February 14, 1997. (Cleveland Aff. ¶ 6). Moreover, while UA did not obtain board approval for the project within the time frame requested by Shurka, it did so shortly thereafter, and this fact was communicated to Shurka.
 
 (Id.
 
 ¶ 5). During this time period, the parties “continued to work on finalizing the lease document and additional issues not covered by the November 1996 agreement.”
 
 (Id.).
 

 In April 1997, Rebecca Wilcox Dow (“Dow”), an in-house counsel, and Dunn, on behalf of UA, and Shurka, on behalf of SPEC, participated in a telephone conference call to discuss certain issues regarding the lease for the Project. (Dow Aff. ¶ 5; Dunn ¶ 5). Dow, one of UA’s witnesses, testified that during this telephone call, the parties reached agreement on the language of the lease to govern the Project, and Shurka gave his authorization for UA representatives to prepare the lease agreement for his execution.
 
 (See, e.g.,
 
 Dow Aff. ¶ 5). In contrast to this version of the telephone call, Shurka states that during the call, he made it clear to UA that SPEC would not sign the lease “unless the necessary financing” could be secured for the Project. (Shurka Aff. ¶ 47). Shurka’s version of the telephone call is confirmed by Cleveland, who testified that during the call, Shurka expressed his concern about SPEC’s ability to obtain financing for the Project, and thus the parties agreed that SPEC “could cancel the lease agreement if SPEC exercised its best efforts to obtain financing but was unable to obtain it.” (Cleveland Aff. ¶ 7).
 

 On June 2, 1997, Dunn sent Shurka a version of the lease agreement for the Project signed by UA, which contained the financing provision discussed above. (Dunn Aff. ¶ 6, Exh. 2 ¶ 63; Dow Aff. ¶ 5). Later in June, Shurka raised several additional points, which were agreed to by UA. (Dunn Aff. ¶ 6). Nonetheless, Shurka testified that Defendants did not believe that the lease agreement which Dunn sent him on June 2, 1997 was complete and he did not sign it. (Shurka Aff. ¶ 48). Absent a written agreement, on July 7,1997, Shurka informed Dunn that SPEC entered into a lease with one of UA’s competitors— Crowne Theatres — for the Project. (Dunn Aff. ¶ 6). SPEC terminated that lease in November 1997, without Crowne ever having occupied the site. (Memorandum and Order, dated Nov. 5, 1998, docket entry number 47, at 2).
 

 On July 18, 1997, UA commenced an action alleging (1) breach of contract; (2) misappropriation; (3) fraud; (4) conversion; (5) breach of fiduciary duty; (6) copyright infringement; and (7) unjust enrichment. The defendants then moved, pursuant to Rule 12(b)(6), to dismiss the complaint for failure to state a claim. It was the defendants’ contention that, no lease having been signed by them, the statute of frauds precluded the enforceability of the alleged oral agreement. The plaintiffs responded by invoking the doctrine of equitable estoppel to neutralize the statute of frauds. Bound as it was to accept the allegations of the complaint as true, the Court held in a Memorandum and Order dated November 19, 1997, familiarity with which is assumed, that the facts as alleged might support the applicability of an equitable estoppel or the prin
 
 *347
 
 ciple of part performance which the Court raised
 
 sua sponte
 
 warranted the denial of the motion as to the breach of contract, fraud and copyright claims. The motion was granted as to the other claims.
 

 The three surviving claims were not pursued. The parties obviously continued to negotiate because on or about March 26, 2998, Shurka, the President of SPEC, executed the lease agreement previously forwarded to it on June 2, 1997. (Supp. Compl. ¶ 31A; Nagin Decl. Exh. 5). It is crucial to note that paragraph 81 of that agreement states that it “contains the entire and only agreement between the parties, and no oral statements or representations or prior written matter not contained in this instrument shall have any force or effect.” (Lease ¶ 81, attached to Compl., signature page of lease attached to Hirth Aff. Exh. D). The lease agreement contained the financing contingency discussed above, which allowed SPEC to cancel the lease within 90 days of its execution in the event that it could not secure financing for the Project. (Lease ¶ 63, attached to Compl.). Pursuant to that provision, SPEC cancelled the lease agreement on June 22,1998. (Nagin Decl. Exh. 6).
 

 PROCEDURAL BACKGROUND
 

 The Court briefly describes the procedural background of this litigation to the extent necessary for its decision. UA commenced this action on July 18, 1997 before the lease agreement was executed by SPEC.
 
 (See
 
 Compl., Hirth Aff. Exh. A). Defendants filed an answer to the complaint on December 8, 1997. (Hirth Reply Aff. Exh. G). Based on the executed lease signed in March 1998 after the complaint was filed, SPEC moved for summary judgment contending that the signed lease constituted performance on its part of all of its obligations which rendered the Plaintiffs action moot. In a Memorandum and Order, familiarity with which is assumed, the Court denied the motion.
 
 See
 
 1998 WL 938732 (E.D.N.Y. Nov.5, 1998), holding that “insofar as it is bottomed upon a claim of mootness [it] must be denied as a matter of law.”
 
 [4]
 
 Referring back to the Court’s Memorandum and Order of November 19, 1997, which held that the claims noted above survived the Defendants’ motion to dismiss, those claims were still “live” and required the denial of the motion. 1998 WL 938732 * 3. The denial of the motion was not appealed. On September 1, 1999, UA, with the Court’s permission, filed a supplemental complaint (“Supp.Compl.”) arising out of SPEC’s decision to cancel the lease agreement, alleging that Defendants failed to make “good faith” efforts to obtain financing for the Project. (Hirth Aff. Exh. B, attaching Supp. Compl.). During briefing of the pending motions, Defendants “consent[ed] to the voluntary discontinuance with prejudice” of UA’s supplemental complaint. (Defs. Reply Mem. at 2 & n. 2). A review of the docket sheet fails to reflect a signed stipulation to that effect. While the Court recognizes that ordinarily a stipulation of dismissal with prejudice under Fed. R.Civ.P. 41 must be filed as a condition precedent to its effectiveness because otherwise the Court would not become aware of it,
 
 see Orsini v. Kugel,
 
 9 F.3d 1042, 1045 (2d Cir.1993), here, the Court (and the parties) have been operating on the as
 
 *348
 
 sumption that the supplemental complaint has been dismissed with prejudice consistent with Defendants’ representations in their brief. Therefore, the Court treats the supplemental complaint as having been dismissed with. prejudice as of November 13, 2001, when Defendants filed their reply memorandum.
 

 UA filed for Chapter 11 bankruptcy in September of 2000. (Hirth Reply Aff. ¶ 6). A joint plan of reorganization was confirmed by the Bankruptcy Court in an order dated January 22, 2001.
 
 (See id.
 
 Exh. F).
 

 In December 2000, Plaintiff moved to dismiss this action with prejudice pursuant to Fed.R.Civ.P. 41(a)(2) following the Defendants refusal to stipulate to that effect. (PL Mem. at 1). On March 29, 2001, Defendants moved for summary judgment and on February 22, 2002 they moved for an order imposing sanctions on Plaintiff.
 

 DISCUSSION
 

 Plaintiff argues that the Court should grant its motion to dismiss this case with prejudice under Fed.R.Civ.P. 41(a)(2), and therefore it should not reach Defendants’ motions for summary judgment and sanctions. As set forth below, since the Court concludes that Defendants are entitled to summary judgment on the remaining causes of action in the complaint for breach of contract, fraud and copyright infringement, and denies their request for sanctions, it does not need to address Plaintiffs Rule 41 motion because it dismisses the case with prejudice.
 

 I.
 
 Defendants ’ Summary Judgment Motion
 

 The standard for granting summary judgment is well established. Federal Rule of Civil Procedure 56(c) provides that summary judgment “shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.” A genuine issue as to a material fact exists when there is sufficient evidence favoring the nonmoving party such that a jury could return a verdict in its favor.
 
 Anderson v. Liberty Lobby, Inc., 477
 
 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The substantive law governing the case will identify those facts which are material.
 
 Id.
 
 at 248, 106 S.Ct. 2505. Therefore, the nonmoving party “may not rest upon the mere allegations or denials” of its pleadings; rather, its response must go beyond the pleadings to “set forth specific facts showing that there is a genuine issue for trial.” Fed.R.Civ.P. 56(e);
 
 see also Celotex Corp. v. Catrett,
 
 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986);
 
 Ying Jing Gan v. City of New York,
 
 996 F.2d 522, 532 (2d Cir.1993) (the nonmoving party must produce evidence in the record and “may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible”). However, in determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party.
 
 See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
 
 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing
 
 United States v. Diebold, Inc.,
 
 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)).
 

 Each of the three causes of action on which Defendants seek summary judgment is discussed below.
 

 A. Breach of Contract
 

 Defendants assert that Plaintiffs own documents reveal that the parties never reached agreement in November 1996 on the material terms of a lease. In addition,
 
 *349
 
 Defendants argue that Plaintiff has failed to come forward with admissible evidence to support its position that its actions following the alleged “meeting of the minds” in November 1996 constituted “partial performance” of the lease agreement. The parties devote virtually all of their arguments to the significance of the events predating the execution of the lease agreement on March 26, 1998. In particular, they focus on the parties’ intent regarding the November 1996 oral agreement as reflected in the 1/21/97 letter and 2/7/97 memo set forth above. Curiously, only Plaintiff discusses the relevance of the lease agreement which was fully executed as of March 26, 1998, and argues that it supports its position that an oral agreement existed as of November 1996. (PI. Mem. in Response to Defs. Sur-Reply at 8).
 

 The hiatus of more than 16 months between the alleged oral agreement of November 19, 1996, and the written agreement of March 26, 1998, invites the inference that much was left to be agreed upon during that interim and therefore no agreement existed before then. That inference aside, the Court finds that for the reasons that follow, the written agreement is fatal to the Plaintiffs claims.
 

 The fully executed lease contains an integration clause,
 
 see
 
 Lease ¶ 81, that extinguishes any claims which Plaintiff may have asserted based on oral agreements or representations which Defendants allegedly made prior thereto.
 
 See id.
 
 (“no oral statements or representations or prior written matter not contained in this instrument shall have any force or effect”).
 
 See also Bekhor v. Josephthal Group, Inc.,
 
 2000 WL 1521198, at *4 (S.D.N.Y. Oct.13, 2000) (granting summary judgment to defendant on contract claim and finding “evidence that the parties orally agreed to a term or condition not contained in the written contract contradicts the Settlement Agreement’s integration clause”);
 
 Proteus Books Ltd. v. Cherry Lane Music Co.,
 
 873 F.2d 502, 509-10 (2d Cir.1989) (when a contract contains an integration clause, extrinsic evidence may not be admitted to prove different or additional terms in the contract, although such evidence may be admitted to interpret ambiguous terms of an integrated contract). Accordingly, that part of Plaintiffs breach of contract claim predicated on events pri- or to March 26, 1998 when SPEC signed the lease agreement is precluded by the integration clause and is therefore dismissed.
 

 Further, Plaintiff has failed to raise a material issue of fact that Defendants breached the fully executed lease agreement. To the contrary, Plaintiff alleges in conclusory fashion in the supplemental complaint that Defendants breached the lease agreement because they failed to seek financing for the Project in “good faith.” (Supp. Compl. ¶ 31D; Lease ¶ 63;
 
 see also
 
 Cleveland Aff. ¶ 7 (“In light of Mr. Shurka’s concerns, the parties agreed that SPEC could cancel the lease agreement if SPEC exercised its best efforts to obtain financing but was unable to obtain it”)). However, other than the bare
 
 ipse dixit
 
 allegations set forth in the supplemental complaint, Plaintiff has failed to offer any evidence that Defendants acted in “bad faith” with respect to their effort to acquire financing for the Project. To the contrary, Defendants have submitted evidence which establishes that they expended substantial time and resources in attempting to secure the financing for the Project but were unsuccessful due, at least in part, to UA’s weak financial condition.
 
 [5]
 
 
 *350
 
 For example, Shurka wrote a letter to Tim Tarpley, UA’s Senior Vice President, Development, dated June 12, 1998, which was ten days prior to the time the Defendants had to cancel the lease agreement if they were unable to obtain financing, stating, in relevant part, as follows:
 

 As you are aware, at least since March 12, 1998, SPEC has had a problem with UA. in its ability to secure a construction loan based on the lease agreement with U.A. It has been made very clear to you and other U.A. executives at our meeting and later on in our telephone conversations, that, we in SPEC are unable to secure a construction loan for this project based on U.A. as our tenant, this in fact was our problem as early as 1996.
 

 [S]ince our initial meeting, and through our last conversation late last month, you continued to assure me and others, that the financing of our project will not be a problem. In fact, when I brought to your attention that time is of the essence and I asked you what will happen if you will not be able to help SPEC in securing the construction loan within the ninety (90) day period [provided in the lease], your response was that we will cross that bridge when this happens and you added that it will not come to it.
 

 Once again, we are doing our best efforts to secure a construction loan, but we simply are unable to do so. We do not know what more we can do, basically no lender that we know of, is willing to lend us the construction loan, based on this lease agreement with U.A. as SPEC’s tenant.
 

 As previously stated to you, if you or anyone else in your company, believes that we did not use our best efforts to secure the financing and/or have any suggestions to what more we can do, please notify us immediately.
 

 If after all, it will get to the point that this lease must be canceled due to the inability to secure the construction loan, I hope that U.A. will have the decency to leave us alone and let us go on our way. I am asking you, please do not continue causing us further damages by preventing us from going ahead with our project.
 

 (Shurka Aff. Exh. L).
 

 Moreover, following SPEC’s cancellation of the lease agreement because it could not obtain financing for the Project, it received a letter from UA in which Plaintiff asserted that UA “denies that [SPEC] ha[s] the right to cancel the lease agreement” because a company called ORIX “is willing to make a loan commitment based upon the lease” between them. (Shurka Aff. Exh. N). In response, Shurka contacted ORIX to inquire whether, based on Plaintiffs representation, ORIX would, in fact, provide financing, notwithstanding that SPEC had already cancelled the lease agreement and therefore had no obligation to continue to seek financing. By letter dated September 11,1998, almost three months after SPEC cancelled the lease agreement, ORIX stated that it “is not now willing,
 
 nor has it been willing in the past,
 
 to consider a loan on the Sun Plaza Center with United Artists as the tenant, with or without a letter of credit.” (Shurka Aff. Exh. 0) (emphasis added).
 

 Further evidence of Defendants’ “good faith” effort to obtain financing for the Project is reflected by Shurka continuing to contact banks at least through July 12, 1999, more than one year after SPEC can-celled the lease agreement. (Shurka Aff. Exh. P). During this time period, Defendants contacted banks which Plaintiff suggested would offer financing for the Pro
 
 *351
 
 ject. Not one agreed to do so.
 
 (See, e.g.,
 
 Shurka Aff. Exhs. P & R).
 

 Against this background, Plaintiffs allegations that Defendants breached the lease agreement because they did not seek financing in good faith are baseless. Summary judgment is therefore granted to Defendants on Plaintiffs breach of contract cause of action.
 

 B. Fraud
 

 The elements of common law fraud are: (1) the making of a material false representation or the omission of a material fact; (2) made with knowledge of its falsity and an intent to defraud; (3) leading to reasonable reliance on the part of the plaintiff; and (4) actual damages as a result of such reliance.
 
 See Diduck v. Kaszycki & Sons Contractors, Inc.,
 
 974 F.2d 270, 276 (2d Cir.1992). Plaintiffs fraud claim fails for the same reason that its breach of contract claim fails, namely, the integration clause in the lease agreement bars any cause of action predicated on purported oral representations made prior to the execution of that agreement in March 1998. Based on the integration clause, Plaintiff, a sophisticated corporation, has not alleged, nor can it, that it reasonably relied on any oral representations made by Defendants prior to the execution of the lease, which constitute the sole basis for the fraud claim.
 
 See, e.g., Harsco Corp. v. Segui,
 
 91 F.3d 337, 345 (2d Cir.1996) (a fraud claim could not proceed where allegations of fraud were directly contradicted by written documents which were the product of arms-length negotiations by sophisticated parties);
 
 Emergent Capital Inv. Mgmt., L.L.C. v. Stonepath Group, Inc.,
 
 165 F.Supp.2d 615, 622 (S.D.N.Y.2001) (“[e]ven if an integration clause is general, a fraud claim will not stand where the clause was included in a multi-million dollar transaction that was executed following negotiations between sophisticated business people and a fraud defense is inconsistent with other specific recitals in the contract”). Reliance, based upon disputed representations allegedly made, is unreasonable and undermined by an express written disclaimer that oral representations shall have no force or effect. Notwithstanding the knowledge it had that SPEC had entered into and terminated a lease for the same property with Crowne Theatres in 1997, Plaintiff continued to negotiate with SPEC and entered into a written lease with it in March 1998, conduct which not only belies any claim of reliance, but any claim of damages as well.
 

 Moreover, Plaintiff has not proffered any evidence that it suffered any damages as a result of Defendants’ purported fraud. The undisputed facts remain, that absent Defendants’ failure to obtain financing for the Project, which they sought to obtain in good faith, that written lease would have remained in effect.
 
 Jones v. Whelan,
 
 2002 WL 485729, at * 10 (S.D.N.Y. Mar.29, 2002) (“Since Plaintiffs fail to provide a scintilla of evidence with respect to the damage element of their fraud claim, Defendants’ ... motion for summary judgment is granted as to the fourth claim”).
 

 Accordingly, the Court grants Defendants’ summary judgment motion with respect to Plaintiffs claim for fraud.
 

 C. Copyright Infringement
 

 A
 
 prima facie
 
 claim of copyright infringement consists of two elements: “(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.”
 
 Sony Music Entertainment Inc. v. Does 1-40,
 
 326 F.Supp.2d 556, 565 (S.D.N.Y.2004). “It is generally not possible to establish copying as a factual matter by direct evidence, as it is rare that the plaintiff has available a witness to the physical act of copying.... Therefore, copying is ordinarily established indirectly by the plaintiffs proof of
 
 *352
 
 access and substantial similarity.”
 
 Long-man Fabrics v. Graff Californiawear, Inc.,
 
 160 F.3d 106, 115 (2d Cir.1998) (internal quotations omitted) (quoting 4 Melville Nimmer and David. Nimmer, Nimmer on Copyright § 13.01[B] (1998)).
 

 Here, Plaintiff has satisfied the first element through evidence of a registration certificate covering its copyright of the architectural plans it developed for the Project.
 
 See
 
 17 U.S.C. § 410(c) (providing that a “certificate of [copyright] registration made before or within five years after first publication of the work shall constitute
 
 prima facie
 
 evidence of the validity of the copyright”);
 
 Boisson v. Banian, Ltd.,
 
 273 F.3d 262, 268 (2d Cir.2001). A registration certificate establishes a statutory presumption that the copyrighted work is original.
 
 Id.
 
 This statutory presumption of validity shifts the burden to Defendants to prove that Plaintiffs copyright for the architectural plans is invalid.
 
 See Fonar Corp. v. Domenick,
 
 105 F.3d 99, 104 (2d Cir.1997).
 

 The “presumption of validity may be rebutted where other evidence in the record casts doubt on the question.”
 
 Fo-nar Corp.,
 
 105 F.3d at 104 (quotation and citations omitted). Defendants argue that Plaintiff does not have a valid copyright, and Defendants cannot be found liable for copyright infringement, because the architectural plans were developed by Defendants’ architect, and not Plaintiffs. (Shur-ka Aff. ¶ 45). In support of their position, Defendants submit architectural plans, dated August 14, 1996, which they developed and shared with Plaintiff prior to the parties entering into an alleged oral agreement for a lease governing the Project. (Shurka Aff. Exh. H). However, a review of the record reveals that Plaintiff has submitted evidence that it hired an architect, Mr. Corva, to create plans for the Project after November 1996, when the parties allegedly agreed, orally, to material terms of a lease agreement. (Compl. Exh., attaching architectural plans and copyright registration for those plans). Therefore, viewing the evidence in the light most favorable to Plaintiff, the Court concludes for purposes of this summary judgment motion that Plaintiff owns a valid copyright in the architectural plans attached to the complaint.
 

 Plaintiffs claim for copyright infringement fails as a matter of law, however, because it has not proferred any evidence that Defendants copied Plaintiffs architectural plans which it claims it developed after November 1996. The only support for Plaintiffs claim that Defendants copied its architectural plans are the allegations to that effect set forth in the complaint and nothing more. Under well established principles, this is insufficient to create a genuine issue of material fact warranting the denial of Defendants’ summary judgment motion on this claim.
 
 See, e.g., Dzaba v. Haythe & Curley,
 
 1996 WL 31156, at *2 (S.D.N.Y. Jan.26, 1996) (to defeat summary judgment, a plaintiff “may not rest'on the allegations in [its] pleadings, but must adduce ‘significant probative supporting evidence’ demonstrating that a factual dispute exists”) (quoting
 
 Anderson,
 
 477 U.S. at 247, 106 S.Ct. 2505),
 
 aff'd,
 
 112 F.3d 503, 1996 WL 560746 (2d Cir.1996).
 

 II.
 
 Defendants ’ Motion for Sanctions
 

 Defendants move this Court for an order imposing sanctions against Plaintiff pursuant to the Court’s inherent power. In
 
 Chambers v. NASCO, Inc.,
 
 501 U.S. 32, 45-46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991), the Supreme Court set forth grounds upon which a federal court may exercise its inherent power to award attorney’s fees. Most pertinent is the Court’s discussion of assessing attorney’s fees “when a party has acted in bad faith,
 
 *353
 
 vexatiously, wantonly, or for oppressive reasons.” (internal quotation marks and citations omitted). Awarding attorney’s fees as a sanction for bad faith conduct “reaches a court’s inherent power to police itself, thus serving the dual purpose of vindicating judicial authority without resort to the more drastic sanctions available for contempt of court and making the prevailing party whole for expenses caused by his opponent’s obstinacy.”
 
 Id.
 
 at 46, 111 S.Ct. 2123 (internal quotation marks omitted). The Court cautioned that “[bjecause of them very potency, inherent powers must be exercised with restraint and discretion.”
 
 Id.
 
 at 44, 111 S.Ct. 2123.
 

 “In order to impose sanctions pursuant to its inherent power, a district court must find that: (1) the challenged claim was without a colorable basis and (2) the claim was asserted in bad faith,
 
 i.e.,
 
 motivated by improper purposes such as harassment or delay.”
 
 Schlaifer Nance & Co. v. Estate of Warhol,
 
 194 F.3d 323, 336 (2d Cir.1999).
 

 A. Colorability
 

 Regarding the first requirement, the court in
 
 Schlaifer Nance
 
 stated: “A claim is entirely without color when it lacks
 
 any
 
 legal or factual basis.... Conversely, a claim is colorable when it has some legal and factual support, considered in light of the reasonable beliefs of the individual making the claim.”
 
 Id.
 
 at 337 (internal quotation marks and citations omitted). Thus, the relevant question on a motion for sanctions is whether a reasonable plaintiff “could have concluded that facts supporting the claim
 
 might be established,
 
 not whether such facts actually
 
 had been established.” Id.
 
 (internal quotation marks omitted).
 

 As an initial matter, the Court addresses the significance of its grant of summary judgment in favor of Defendants on Plaintiffs breach of contract claim. Specifically, the Court based its decision on the fact that the integration clause in the March 26, 1998 fully executed written lease precludes Plaintiffs claim that it relied on the oral agreement reached by the parties in November 1996.
 
 [6]
 

 See supra.
 
 The court in
 
 Schlaifer Nance
 
 addressed the significance of granting judgment as a matter of law on a plaintiffs claims with respect to a defendant’s motion for sanctions. It held that because a claim that fails as a matter of law could nonetheless be based on facts that might have been established, “judgment as a matter of law against a claim is a necessary, but not a sufficient, condition for a finding of a total lack of a colorable basis.” 194 F.3d at 337 (holding plaintiffs fraud claim was colorable even though district court had granted defendant’s motion for judgment as a matter of law setting aside jury verdict for plaintiff because evidence was not unequivocal that there was no reasonable basis for plaintiffs reliance on defendant’s representations). Thus, this Court’s grant of summary judgment in favor of Defendants satisfies the necessary condition of the colorability requirement, but does not end the Court’s analysis.
 

 Guided by these principles, the Court turns to the parties’ arguments in this case. In moving for sanctions, Defendants argue that Plaintiffs complaint rests on three false factual contentions, namely, that the parties reached an oral agreement
 
 *354
 
 on the material terms of the lease in November 1996; that Defendants repeatedly assured UA that SPEC would sign a written lease thereafter; and that ÜA prepared a site plan for the Project and drafts of a written lease in reliance on Defendants’ representations.
 
 [7]
 
 (Defs. Mem. at 2). Defendants assert that “it is incontrovertible that UATC knew,
 
 at the time it filed the Complaint,
 
 and throughout the pendency of the litigation, that there existed no possibility of developing any factual support for these false contentions” in the complaint.
 
 (Id.
 
 at 3) (emphasis in original). Defendants rely principally on documents in UA’s possession to show that UA did not reasonably believe it had an oral agreement with SPEC as of November 1996. The first document, an interoffice memorandum dated February 7,1997 from Cleveland of UA to Kurt Hall, states: “The Avenue U project will also be lost as of Friday, February 14th if the lease is not fully negotiated and signed. Efie Shurka, the landlord, calls me on a daily basis.... If we cannot or will not move forward, we should simply tell the developers the truth and allow them to go in a different direction.” (Shurka Aff. Exh. G). The second document on which Defendants rely is a letter dated January 21, 1997 from UA’s broker, Robert Greenstone, to Cleveland. That letter states: “My associate, David Rosenberg spoke to Efe Shurka today. Efe informed David that you and Efe spoke last week. At that time Efe agreed to give you a month to obtain the go-ahead on the Avenue U project from UA’s Board of Directors.... Efe remains committed to the United Artists deal.... ” (Shurka Aff. Exh. E). In opposition, Plaintiff asserts that although UA obtained board approval on February 21, 1997 and not on February 14, the parties continued with the Project. (PI. Opp. at 7). Moreover, facts in the record support the conclusion that the 1/21/97 letter and the 2/7/97 memo do not unequivocally show the absence of an oral agreement as of November 1996. Affidavits submitted by Plaintiff indicate that persons acting on behalf of UA believed that the parties reached an agreement regarding the material terms of the lease in November 1996 and continued to negotiate outstanding issues in April 1997.
 
 (Id.
 
 at 8, 11, 14). Thus, the facts as they existed at the time Plaintiff filed its complaint on July 18, 1997 permitted Plaintiff reasonably to believe that additional facts might be established in the discovery process to support its breach of contract, fraud and copyright claims.
 
 [8]
 

 See Schlaifer Nance,
 
 194 F.3d at 337. Moreover, the Defendants’ assertion that Plaintiff falsely contended that Defendants repeatedly as
 
 *355
 
 sured UA that SPEC would sign a written lease thereafter, and that UA prepared drafts of a written lease in reliance upon those representations rings hollow in light of the fact that the Defendants continued to pursue a written lease and actually executed one in March 1998, nearly one year after the complaint was filed. Accordingly, the Court finds that Defendants have failed to establish that Plaintiffs claims were without a colorable basis.
 
 [9]
 

 B. Bad Faith
 

 In
 
 Schlaifer Nance,
 
 the court explained that “[b]ad faith may be inferred only if the actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay.” 194 F.3d at 336 (internal quotation marks omitted). Moreover, a court’s “factual findings of bad faith must be characterized by a high degree of specificity.”
 
 Id.
 

 With respect to the requirement of bad faith, Defendants contend that Plaintiffs only motivation for filing the complaint was to tie up the Site in litigation thereby preventing competitors from developing the property. (Defs. Mem. at 10). Moreover, they argue that bad faith is evidenced by the fact that the
 
 lis pen-dens
 
 Plaintiff had filed on the Site expired in October 2000 and that shortly thereafter, in December of 2000, Plaintiff filed a Rule 41 motion for voluntary dismissal after years of litigation.
 
 (Id.).
 
 Given the Court’s finding that Plaintiffs complaint was not without a colorable basis in fact, it further finds that Defendants provide no evidence to suggest that Plaintiffs sole motive in filing its complaint was to deter development of the Site by competitors.
 
 See Schlaifer Nance,
 
 194 F.3d at 340 (finding that there was a colorable basis for plaintiffs claim precluded argument that the complaint was filed frivolously with respect to bad faith requirement);
 
 see also R.B. Ventures, Ltd. v. Shane,
 
 2000 WL 1010400, at **3-4 (S.D.N.Y. July 20, 2000) (documentary evidence provided a reasonable basis for plaintiff to have initiated its breach of contract action notwithstanding that the jury found for defendant). Furthermore, Defendants’ contention that the timing of Plaintiffs motion for voluntary dismissal suggests an improper purpose is undermined by Plaintiffs explanation of the same event: Plaintiff asserts that it moved to dismiss due to financial inability to continue litigation as evidenced by the fact that the motion closely followed UA’s Chapter 11 bankruptcy filing in September 2000. (PI. Opp. at 19 and n. 12).
 
 [10]
 
 Defendants’ general criticisms of Plaintiffs actions in the litigation fail to meet their burden of providing specific support for the requirement of bad faith.
 
 See Schlaifer Nance,
 
 194 F.3d at 340 (finding that although subpoenas and depositions taken by plaintiff were onerous, they did not rise to level of bad faith). Accordingly, because Defendants fail to show that Plaintiffs complaint was without a colorable basis and that Plaintiffs claims were asserted in bad faith, the Court denies Defendants’ motion for sanctions.
 

 CONCLUSION
 

 For the foregoing reasons, the Court grants Defendants’ motion for summary
 
 *356
 
 judgment and denies Defendants’ motion for sanctions. Granting Plaintiffs motion for voluntary dismissal pursuant to Fed. R.Civ.P. 41(a)(2) is thus superfluous. Accordingly, the Court respectfully directs the Clerk of Court to close this case.
 

 SO ORDERED.
 

 [1]
 

 . Defendants filed motions to amend their answer to assert counterclaims. They have elected to withdraw those motions. (Defs. Rep. Mem. at 1).
 

 [2]
 

 . Plaintiff argues that the Court should deny Defendants' cross-motion for summary judgment because at the time of the filing of their cross-motion, Defendants failed to submit a statement of undisputed material issues of fact pursuant to Local Rule 56.1 of the United States District Court for the Eastern District of New York. The Court rejects this argument for three reasons. First, at the time of the service of their cross-motion, Defendants indicated that the affidavit of Efraim Shurka constituted their Rule 56.1 statement. (Shurka Aff. ¶ 3). Second, Defendants did ultimately submit a Rule 56.1 statement during the time that Defendants' cross-motion was briefed (and to which Plaintiff submitted a Rule 56.1 statement in opposition), and thus Plaintiff cannot argue in good faith that it was prejudiced in any way by Defendants' initial failure to serve the Rule 56.1 statement. Finally, the purpose of the Rule 56.1 statement is to eliminate the need for the Court to independently examine the entire record without guidance from the parties, and this has been accomplished by the extensive submissions of the parties, including their Rule 56.1 statements.
 
 Giannullo v. City of New York,
 
 322 F.3d 139, 145 (2d Cir.2003).
 

 [3]
 

 . In a motion to dismiss the complaint which was denied in a Memorandum and Order dated November 19, 1997, familiarity with which is assumed, all the allegations of the complaint were assumed to be true, without more.
 

 [4]
 

 . The significance of the integration clause for the merits of the motion was not at all mentioned. The Court would note that the denial of that motion does not implicate the law of the case doctrine since the significance of that clause for the determination of the motion was not resolved either expressly or by necessary implication. In any event, the application of that “doctrine is discretionary and does not limit a court’s power to reconsider its own decision prior to final judgment.”
 
 See Aramony v. United Way of America,
 
 254 F.3d 403, 410 (2d Cir.2001).
 

 [5]
 

 . As set forth above, UA ultimately filed a voluntary Chapter 11 bankruptcy petition on September 5, 2000. (Hirth Reply Aff. Exh. F).
 

 [6]
 

 . The Court grants summary judgment in favor of Defendants on Plaintiff's fraud claim for the same reason. The Court also finds that Plaintiff's copyright infringement claim fails as a matter of law because, although there is sufficient evidence that Plaintiff owned a valid copyright in the architectural designs by Mr. Corva attached to Plaintiff's complaint, Plaintiff has failed to adduce evidence to establish that Defendants infringed that copyright.
 
 See supra.
 

 [7]
 

 . Defendants also contend that although Plaintiff claims that it was the author of the architectural site plan for the Project, Plaintiff was aware at the time it filed the complaint that the architectural plan was developed by Defendants. To that end, Defendants refer to a copy of the site plan which is accompanied by a cover page indicating that the plan document was "Received w/out cover Itr from Mr. Shurka re: Ave. U.”
 
 (See
 
 Shurka Aff. Exh. H). With respect to Defendants’ motion for summary judgment, the Court found that Plaintiff adduced sufficient evidence to establish that it owns a valid copyright in the architectural plans by Mr. Corva.
 
 See supra.
 
 Thus, Defendants' argument regarding the architectural plans does not advance their contention that Plaintiff's claims with respect to this issue lacked merit.
 

 [8]
 

 . Defendants argue that the integration clause in the draft lease exchanged between the parties in June of 1997 undermines Plaintiff's argument that the parties reached a binding oral agreement in November 1996. (Defs. Mem. at 8). Since that written lease was not fully executed by the parties until March 26, 1998, the Court finds that Plaintiff could have had a reasonable belief when it filed its complaint on July 18, 1997 that the parties had reached a binding oral agreement in November 1996 and that the integration clause does not deprive the complaint of a colorable basis for-purposes of this motion.
 

 [9]
 

 . The Court also notes that its denial of Defendants' motion to dismiss in November 1997 lends colorability to Plaintiff's claims.
 
 See Dietze v. Patterson,
 
 1987 WL 28813, at *9 (S.D.N.Y. Dec.14, 1987) ("Having determined that [defendant’s counterclaim] survives plaintiffs' motion to dismiss, the court denies plaintiffs' motion for sanctions.”).
 

 [10]
 

 . The Court notes that in opposing Defendants' characterization of the timing of UA's motion to voluntarily dismiss, Plaintiff also contends that the
 
 lis pendens
 
 expired in July 2000 and not October 2000 as Defendants argue. (PL Opp. at 19 n. 12).