16-2973
Virginia Properties, LLC, v. T-Mobile Northeast LLC

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
_____

August Term, 2016

Argued: June 12, 2017
Decided: July 28, 2017

Docket No. 16-2973


_____

VIRGINIA PROPERTIES, LLC,

*Plaintiff-Appellant,*

v.

T-MOBILE NORTHEAST LLC,

*Defendant-Appellee,*

SKYLINE STEEL FABRICATORS & ERECTORS, INC., AKA

SKYLINE STEEL FABRICATORS & ERECTORS, LLC, INNOVATIVE

ENGINEERING, INC.,

*Third-Party Defendants-Cross-*

*Defendants-Cross-Claimants-Appellees,*

KMB DESIGN GROUP, LLC,

*Appellee*,

T-MOBILE US, INC., OMNIPOINT COMMUNICATIONS, INC.,

*Defendants-Third-Party Plaintiffs-*

*Cross-Defendants.*

_____

Before: CALABRESI, POOLER, *Circuit Judges,* and VILARDO, *District Judge.*[1]

Appeal from a final judgment of the United States District Court for the Southern District of New York (Hellerstein, *J.*).

In April of this year—long after the district court's imposition of sanctions in the case before us—the Supreme Court addressed "a federal court's inherent authority to sanction a litigant for bad-faith conduct by ordering it to pay the other side's legal fees." *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1183-84 (2017). The Court held "that such an order is limited to the fees the innocent party incurred solely because of the misconduct—or put another way, to the fees that party would not have incurred but for the bad faith." *Id*. at 1184. Because the district court's order of sanctions in this case is in serious tension with that holding—and because we find that the district court was misled by the defendants' submissions in awarding such severe sanctions—we VACATE the court's judgment and REMAND for further proceedings consistent with this decision.

—————————————

[1] Judge Lawrence J. Vilardo, United States District Court for the Western District of New York, sitting by designation.

KENNETH E. LEE (Seth L. Levine, Christos G. Papapetrou, *on the brief*), Levine Lee LLP, New York, NY, *for Plaintiff-Appellant Virginia Properties, LLC.*

ROBERTA KAPLAN (Darren W. Johnson, *on the brief*), Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY, *for Defendant-Appellee T-Mobile Northeast LLC.*

*Also on the brief*: Daniel C. Folchetti, Law Office of Lori D. Fishman, Tarrytown, NY, *for Third-Party Defendants-Cross-Defendants-Cross-Claimants-Appellees Innovative Engineering, Inc.*; Patrick W. Brophy, McMahon, Martine & Gallagher, LLP, Brooklyn, NY, *for Third-Party Defendants-Cross-Defendants-Cross-Claimants-Appellees Skyline Steel Fabricators & Erectors, Inc.*

JOYCE E. BOYLE, McElroy, Deutsch, Mulvaney & Carpenter, LLP, New York, NY, *for Appellee KMB Design Group, LLC.*

VILARDO, *District Judge*:

In April of this year—long after the district court's imposition of sanctions in the case before us—the Supreme Court addressed "a federal court's inherent authority to sanction a litigant for bad-faith conduct by ordering it to pay the other side's legal fees." *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1183-84 (2017). The Court held "that such an order is limited to the fees the innocent party incurred solely because of the misconduct—or put another way, to the fees that party would not have incurred but for the bad faith." *Id*. at 1184.

Because the district court's order of sanctions in this case is in serious tension with that holding—and because we find that the district court was misled by the defendants' submissions in awarding such severe sanctions—we VACATE the court's judgment and REMAND for further proceedings consistent with this decision.

**BACKGROUND**

Plaintiff-appellant Virginia Properties, LLC, appeals from a final judgment of the United States District Court for the Southern District of New York (Hellerstein, *J.*).  Virginia Properties commenced this action in April 2013, seeking to recover for property damage to its apartment building in the Bronx. T-Mobile Northeast LLC ("T-Mobile") had leased space on the roof of the building for cell tower equipment, which both sides agreed caused some damage to the building.  While T-Mobile never admitted responsibility for a particular damage amount, it offered to settle with Virginia Properties for $350,000, the amount T-Mobile believed was reasonably related to the damage caused by its equipment.  But Virginia Properties declined, claiming that the damage caused by T-Mobile's equipment was more extensive.  And so the case became a dispute about just how much damage T-Mobile had caused.

4

After a somewhat lengthy period of discovery, T-Mobile and the third-party defendants, Skyline Steel Fabricators & Erectors, Inc., and Innovative Engineering, Inc., moved for sanctions. According to T-Mobile and the third-party defendants (collectively, the "defendants"), Virginia Properties committed an "elaborate and pervasive fraud on the Court." App'x at 244. They claimed that the fraud included attributing to T-Mobile damages that were unrelated to its equipment, withholding documents that evidenced this duplicity, and even falsifying documents to bolster the plaintiff's claim. The district court agreed, finding that "[t]here was clearly a pattern of misbehavior by plaintiff in this case." Special App'x at 10. By an order filed April 12, 2016, the court granted the motions for sanctions.

Relying on its inherent powers and 28 U.S.C. § 1927, the court dismissed the complaint with prejudice and said that it would require Virginia Properties or its counsel to pay a fine and all their adversaries' litigation costs and attorney's fees. *Id*. at 10-11. After further submissions from the three sets of attorneys who at various times had represented Virginia Properties, "to determine the responsibility of each party for sanctions," *id*., the district court issued a final order, filed August 18, 2016. The court found Virginia Properties

solely liable for a $75,000 fine and $607,493.08 in fees, costs, and expenses (including $21,554.75 to non-party-appellee KMB Design Group, LLC ("KMB")). *Id*. at 68-69.

The reasoning behind the district court's ruling was primarily set forth in the 11-page order that was filed on April 12 and initially granted the sanctions motions. The facts offered to support the district court's decision fall into three categories: (1) "failures to disclose clearly relevant documents," (2) the "apparent forgery of other documents," and (3) a "bad faith attempt to double [the plaintiff's] potential recovery." *Id*. at 6. After the court issued its final order in August 2016—dismissing the case, fining the plaintiff $75,000, and ordering the plaintiff to reimburse all attorney's fees and costs for the defendant, third-party defendants, and non-party KMB—the plaintiff appealed.

DISCUSSION

## I.     Appellate Review of Sanctions

"We review all aspects of a [d]istrict [c]ourt's decision to impose sanctions for abuse of discretion."  *Schlaifer Nance & Co., Inc. v. Estate of Warhol*, 194 F.3d 323, 333 (2d Cir. 1999).  But we require "a high degree of specificity in the factual findings of lower courts" upon which sanctions for bad faith are based.  *Weinberger v. Kendrick*, 698 F.2d 61, 80 (2d Cir. 1982).  "A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence."  *Schlaifer Nance & Co.*, 194 F.3d at 333 (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990)).  The imposition of sanctions also is improper when the court's order "cannot be located within the range of permissible decisions."  *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 169 (2d Cir. 2001).

We have recognized that "the district court is better situated than the court of appeals to marshal the pertinent facts and apply the fact-dependent legal standard that informs its determination as to whether sanctions are warranted."  *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 71, 78 (2d Cir. 2000) (quotation omitted).  We are particularly cognizant of that here, where some sanctions may be

warranted. Nevertheless, because the record[2] has left us "with the definite and firm conviction that a mistake has been committed," *Zervos*, 252 F.3d at 168 (quotation omitted), we find that the district court exceeded the bounds of its discretion in imposing the severe sanctions in this case.

The defendants convinced the district court that Virginia Properties committed a fraud on the court. But a careful inspection of the record convinces us that notwithstanding the defendants' rhetoric and accusations, there is no evidence of fraud. We therefore vacate the sanction of dismissal and the fine.

We also vacate and remand the award of costs and attorney's fees. There is no question that some discovery material was provided late in the game and that sanctions may have been appropriate for that discovery abuse. But there is a real question about whether any such sanctions should have been assessed against Virginia Properties or against its prior counsel. The district court's initial instinct was to hold a hearing on that issue, and that instinct was a good one.

---

[2] Virginia Properties has argued that it did not have a fair opportunity to contest the sanctions award prior to the court's first sanctions order filed on April 12, 2016. Under the circumstances, including the punitive nature of the sanctions and the facts revealed in all the material submitted prior to the final judgment, the entire record should be considered. We therefore do just that.

What is more, under the Supreme Court's recent decision in *Goodyear*, the award of *all* costs and attorney's fees cannot stand because it was not causally related to the late discovery. *See* 137 S. Ct. at 1186-88. The Court made clear in *Goodyear* that an award of costs and attorney's fees and sanctions must be related *causally*—and not simply *temporally*—to the sanctionable conduct. *Id*. at 1189. Sanctions beyond that are punitive rather than compensatory and therefore may not be imposed without "procedural guarantees applicable in criminal cases, such as a 'beyond a reasonable doubt' standard of proof." *Id*. at 1186. Because the district court here did essentially what the district court did in *Goodyear*—awarded all costs and attorney's fees for what the court found was particularly egregious conduct—its decision was legally unsound. Even more basically, because the finding of particularly egregious conduct was not supported by the record, the decision was factually unsound as well.

Given the complexity of the facts, including those upon which the district court relied to impose sanctions, we offer the following detailed explanation for our decision.

## II.   The Bases for Sanctions

### A.   "Failures to Disclose Clearly Relevant Documents"

Either Virginia Properties or its counsel failed to disclose relevant documents that—in the district court's words—would have shown "the full extent and nature of the repairs to [the] property." Special App'x at 1. The district court considered the undisclosed documents to be particularly important for two reasons.

First, certain documents that should have been produced early in the litigation revealed that the contractor, DNS Construction ("DNS"), was performing some repairs to the building that were unrelated to any damage caused by T-Mobile's cellular equipment. *See id.* at 3 ("None of the exhibits [attached to the complaint] suggest or admit that any of the work performed [by DNS] was unrelated to the damage allegedly caused by T-Mobile."); *see also* App'x at 254 (declaration in support of sanctions motion, arguing that these documents "revealed—for the first time—that work had been done at the Building that was not related to T-Mobile"). In other words, those documents showed that there actually were "two categories of work," and the failure to

10

disclose those documents—according to the district court—demonstrated "bad faith."  Special App'x at 7.

Second, certain documents created later in the litigation, in connection with Virginia Properties' rent increase ("MCI") and tax abatement ("J-51") applications, attributed about $320,000 of the total price tag for the repairs to "brickpointing, waterproofing, and lintel work," which the district court found had "'nothing to do' with T-Mobile."  *Id.* at 8; *see also id.* at 3-4 ("[W]ork listed in the suppressed documents, including brickpointing, lintel work, and wall repairs, . . . cannot credibly be attributed to . . . T-Mobile.").

As discussed further below, the district court was mistaken in its understanding of the significance of the undisclosed documents, especially those describing repairs as brick pointing, waterproofing, and lintel work.  In fact, those documents are, at a minimum, consistent with T-Mobile's liability for those repairs (or at least most of them).  For that reason, the failure to disclose documents showing *any* unrelated repairs is of the most concern, because that certainly might have prolonged discovery to some extent (e.g., T-Mobile's taking depositions without knowing about the unrelated repairs).  But much of the

11

blame for those disclosure failures may well lie with the Virginia Properties'
previous attorneys.

Indeed, prior to beginning depositions in this case, Robert Spring, the managing member of Virginia Properties, provided documents to his attorneys for purposes of responding to discovery demands, which showed (1) that DNS was performing some unrelated repairs to the building at the same time as the T-Mobile repairs, and (2) that Spring had asked non-party engineer Ted Yen to produce one set of documents for the unrelated repairs and a separate set of documents for the T-Mobile repairs. The documents that Spring provided to his attorneys included:

- a "Memo to the file," which (1) described repairs that DNS was to perform to the rear of the building due to "substantial wear," (2) distinguished those repairs from T-Mobile repairs, and (3) explained that it would be economical to perform all the repairs at once, App'x at 336;

- two sets of Yen's construction drawings, with one 4-page set concerning repairs to the building as a whole and one 4-page set concerning only T-Mobile repairs, *id*. at 1145-52; and

- emails between Spring and Yen, including an email dated June 18, 2012, in which Spring asks for "a COMPLETE set of drawings for T Mobile [sic] work" and a "COMPLETE set of drawings for the other work," *id*. at 338; and an email dated March 18, 2012, in which Spring asked for "2 sets of drawings," *id*. at 341.[3]

The record shows that on June 5, 2014,[4] Spring provided his then-attorneys, Lamb & Barnosky,[5] with the "Memo to the file" and the construction drawings. And on August 27, 2014, Spring provided Lamb & Barnosky with the Yen emails. Despite that, Lamb & Barnosky failed to produce those documents

---

[3] It is worth noting that nothing in these emails even hints at deceit. Spring does not ask Yen to shift any repair costs to T-Mobile—in fact, Spring does not even ask for any documents that show *all* the repair costs. Spring's emails instead seem to display frustration at Yen for treating all the repairs as a single project. Moreover, documents that describe repairs to the whole building, such as Yen's 9-Point Report, do not appear to have been prepared at Spring's behest (discussed more below). So Spring seems to have been intent on segregating T-Mobile costs from wear-and-tear costs, which would have been an appropriate exercise in pursuing payment from T-Mobile for only the damage that its equipment caused.

[4] This is a few months after the first case management order was entered on February 10, 2014.

[5] Virginia Properties was initially represented by Marc Krieg, who drafted the original complaint and produced Rule 26 disclosures. On February 7, 2014, Virginia Properties retained Lamb & Barnosky to assist Krieg. Lamb & Barnosky apparently realized the need to obtain additional documents that were not in Krieg's file, so Virginia Properties' June 2014 and August 2014 productions to Lamb & Barnosky were in response to the attorneys' questions.

13

or a privilege log prior to Spring's deposition in October 2014, and the deposition apparently revealed these disclosure failures to T-Mobile. Eventually, on December 10, 2014—and in response to T-Mobile's additional discovery demands—Lamb & Barnosky produced more than 1000 pages of additional documents that included the Yen emails, but not the other documents listed above.

According to the Lamb & Barnosky attorneys, the reason they did not disclose the "Memo to the file" is because they deemed it not to be responsive. *Id.* at 1043, 1048 ("Since this document involved repairs to the rear of the building and were not part of the 'T-Mobile work going on…' [sic] the memo was not disclosed at that time."). They disclosed only one of the two sets of construction drawings because they did not realize that the drawings were different (i.e., the drawings look very much like versions or drafts of the same thing, with the pages in both sets of drawings labeled "T-100.00," "G-100.00," "A-100.00," and "A-101.00"). *See id*. at 1042-43, 1072. And their excuse for not disclosing the Yen emails was their focus on other things—i.e., "[their] client's emphasis on preparing for the depositions and [because] a comprehensive privilege log had to be prepared." *Id.* at 1076.

14

At least in part because of those issues, the relationship between Virginia Properties and Lamb & Barnosky soured, as the contemporaneous emails between Mark Spring[6] and the attorneys make clear. Indeed, those emails seem to reveal not bad faith on the part of Virginia Properties, but instead surprise and frustration at the lack of earlier disclosure. *See, e.g.*, *id.* at 2357 (Mark Spring: "According to our records the emails at issue were provided to your office on August 27, 2014, well before my father's deposition. Is Rapaport correct that they were not produced until after the deposition?"); *id.* at 2352 (Mark Spring: "[T]hese emails were not privileged in any way, so I fail to see how the privilege log"—i.e., the purported reason for the late disclosure—"relates to this issue."). Those emails also appear to show how Lamb & Barnosky made bad matters worse for Virginia Properties by, in front of the district court, taking an unreasonable position on whether to schedule a further deposition of Robert Spring.[7]

---

[6] Mark Spring is Robert's son and one of the Virginia Properties principals.
[7] At around 8:00 p.m., on March 26, 2015, Mark Spring sent a lengthy email to his attorneys detailing his concerns over the emerging discovery issues. Spring noted "if I have the timeline right, it seems like we are in a bad position going into tomorrow's conference." *Id*. at 2355. On the issue of whether his father would be willing to sit for another deposition, he wrote: "My father does not want to go forward with another deposition. However, if we are forced to do so by the Court or it becomes clear at the

On April 2, 2015, Virginia Properties replaced Lamb & Barnosky with attorney Michael Cibella, who disclosed additional documents, including: on April 14, 2015, the two sets of construction drawings (with added handwritten labels); and on May 1, 2015, the "Memo to the file." Those disclosures were made pursuant to a court order. At around the same time, T-Mobile also uncovered another document that T-Mobile interpreted as revealing the existence of hidden, unrelated repairs to the building—Yen's "9-Point Report," which Yen produced in response to a third-party subpoena.

Unlike the other documents discussed above, Virginia Properties did not provide the 9-Point Report to its counsel. But there is no clear evidence that Virginia Properties should have, either. Indeed, it is not clear when, if ever, Virginia Properties received the 9-Point Report. The report is dated February 23, 2012, and is addressed from Yen to Tariq Tahir of contractor DNS. The report

conference that is the only way to get important discovery or items that we need, *then agree to do so . . . ." Id.* (emphasis added). But the Lamb & Barnosky attorney appears to have misunderstood—or not to have read—those instructions. In the next email in the chain, the Lamb & Barnosky attorney responds: "At 8:00 p.m. on March 26, the night before the status conference, I received your e-mail below informing me that your father did not want to go forward with another deposition. At the conference, therefore, I had no choice but to object to the continued deposition, and I did so until the Judge stopped me from speaking. It was, I believe, because of our unreasonable resistance to the further deposition that the Judge accused me of 'playing games.'" *Id*. at 2354.

does not indicate that a copy was sent to Spring, *see id*. at 319, which makes sense because at that time, Yen had not yet met or been retained by Spring. Although it is possible that Yen later sent the 9-Point Report to Spring, the testimony on that point is equivocal. *See id*. at 357-58;[8] *id*. at 542;[9] *id*. at 732.[10] And unlike other documents in the record, there is no evidence (such as emails, etc.) showing that Spring possessed or even knew about the 9-Point Report at any relevant time. So it may be that Virginia Properties never had the 9-Point Report to produce.

Given the above, it is easy to understand why T-Mobile—and the district court, relying on T-Mobile's representations—may have viewed Virginia Properties with suspicion. It would have appeared that Virginia Properties failed to disclose any of the above-described documents[11] until after having been

---

[8] Yen: "I sent it to Tariq. . . . And *I believe* subsequently to Mr. Spring." *Id*. at 357-58 (emphasis added).

[9]    Q:    Did you email this letter to Robert Spring?
[Yen]: Yeah, I had to have emailed it to him or sent him a copy of it.
Q:    Was it this same exact letter?
[Yen]: *Possibly. I don't recall.*

*Id*. at 542 (emphasis added).

[10] Spring answered "*I believe so*" when asked "was it also provided to you?" *Id*. at 732 (emphasis added).

[11] Although the above-described disclosure failures featured prominently in the sanctions motion and the district court's decision, T-Mobile's brief on appeal focuses on other disclosure failures that were connected to Virginia Properties' J-51 and MCI

17

caught red-handed at Spring's deposition. And even then, it took a few more months, a court order, a third-party subpoena, and a third set of lawyers for Virginia Properties to disclose the rest of the documents. But the further submissions from Virginia Properties and its attorneys raise a real question about whether Virginia Properties or its prior counsel were to blame for the late disclosure. And the more complete excerpts of Yen's deposition testimony attached to those submissions dispel any doubt that T-Mobile's over-the-top rhetoric was largely baseless.

## B. "Apparent Forgery"

The district court used the term "apparent forgery" to refer to "documents that were changed or created specifically to shift the cost of construction work to T-Mobile." Special App'x at 6-7; *see also id.* at 68 (final order of August 18, 2016, finding "manipulation of discoverable documents to mask the fraud"). The

---

applications, including what T-Mobile calls the "Detailed Architectural Drawing" (a 3-page document not discussed in the district court's decision that is repetitive of other J-51 and MCI application documents) and the "Tahir Affidavit." Those and other J-51 and MCI application documents were not disclosed by Virginia Properties until Cibella disclosed them on July 7, 2015. But there is a factual dispute over whether Lamb & Barnosky told Spring that documents connected to the J-51 and MCI applications were not relevant. And despite the importance the district court placed on those documents, they are not inconsistent—at least on their face—with Virginia Properties' theory of damages, as discussed below.

district court's April 12 decision discusses in detail "[o]ne striking example" of this, which involves comparing the "9-Point Report" and the "4-Point Report" (as the parties label them on appeal) of third-party engineer Ted Yen. *Id.* at 7. But this portion of the district court's decision is clearly erroneous.

According to the district court:

> The altered [i.e., 4-Point] report includes additions not found in the original [9-Point] report as well, apparently inserted by Spring or his agents *after* Yen produced the second report, including allegations of negligence, and reports of water leakage through the roof. Yen testified he never opined on either of those topics, or included them in any report.

*Id*. at 7 (emphasis in original).

The district court appears to have been misled by the declaration of defense counsel, Marc A. Rapaport, which was submitted in support of the sanctions motion. Paragraph 34 of the Rapaport Declaration, which the district court cited and borrowed from, reads as follows:

> In his May 2015 deposition testimony, Yen stated that Spring told him to alter his report "specifically for T-Mobile." These alterations included (i) deleting references to the Project's non-T-Mobile components (brick pointing, waterproofing, brickwork, lintel replacement, window sill replacement and rear-wall repair); and (ii) adding embellishments, including allegations of water leakage and negligence, that were not in the Actual Yen Report and that Yen has since contradicted in his sworn deposition testimony.

19

App'x at 253, ¶34 (citations omitted).

Initially, there is no evidence that Spring "told" Yen to "alter" the 9-Point Report as part of some cover-up. In fact, there is no clear evidence that Spring and Yen ever specifically discussed the 9-Point Report at all.[12] The cited Yen testimony simply supports the undisputed—and, without more, innocent—fact that Spring asked Yen for one set of documents showing only the repairs attributable to T-Mobile, and one set of documents showing the unrelated repairs. *Id.* at 365 ("The owner requested me to write it, to specifically give [T-Mobile] their portion of it, and that's what I did."); *see also id.* at 364 (asked why the report addressed only four items, Yen answered "Because it's the same thing,

---

[12] In an excerpt of Yen's deposition testimony not attached to the sanctions motion, which Virginia Properties later submitted, Yen was asked if "anybody [told him] to do the four bullet point letter." *Id*. at 2436. Yen answered "He asked me to write a letter just for the T-Mobile section." *Id*. Yen then was asked if "he" refers to Spring, and Yen said yes. *Id*. Yen was then asked follow-up questions about this conversation, but he was unable to remember more. *Id.* ("I can't remember back three years and two months, I'm sorry, it's mentally not possible for something that specific."). Later, Yen again was asked about this conversation and when it occurred, and Yen decided "It wasn't February 23rd, it was probably -- no, it had to have been Tariq. It had to have been Tariq. Tariq would have told me you need to write a letter for just the T-Mobile portion because I hadn't talked to Mr. Spring yet, and he gave me the name and address and all the information for Mr. Spring." *Id*. at 2438. So Yen initially thought that Spring asked him to prepare the 4-Point Report, but upon reflection concluded that Tariq—not Spring—had made the request.

20

why are we muddling the issue, we did this, we did this. T-Mobile doesn't care about, oh, the roof has to be replaced . . .").

Next, there were no "embellishments," *id.* at 253, in the 4-Point Report. According to the Rapaport Declaration, the embellishments "include[d] allegations of water leakage and negligence, that were not in the Actual Yen Report [i.e., the 9-Point Report] and that Yen has since contradicted in his sworn deposition testimony." *Id.* But the 4-Point Report does not even mention "negligence," *see id.* at 321, so Yen could not have contradicted it on that issue. And although the 4-Point Report discusses water leakage, the testimony cited by defense counsel and the court does not show Yen disavowing or contradicting that part of the report. In fact, none of the deposition testimony cited in the Rapaport Declaration provides any support for the claims of "embellishments."

It is worth noting that the 4-Point Report *does* say that T-Mobile's cell tower was "overloading" the parapet wall and "causing" damage to the plaintiff's building. *Id*. So to the district court, the Rapaport Declaration's use of the term "negligence" might have appeared to be mere semantics. But it was not. Not only is there no opinion concerning "negligence" in the 4-Point Report, but on the very next page of the deposition transcript—i.e., after the page cited in

21

the Rapaport Declaration and the district court's decision—Yen's testimony makes it crystal clear that he was not, in any way, disavowing his opinions in the 4-Point Report:

> And if the wording is different [from the 9-Point Report], the wording is different, but I opined that T-Mobile was attributable for the parapet wall moving, which is even written in [the 9-Point Report]. It might have been slightly different words, but it's still the same context.

*Id.* at 2435. And immediately after that:

> Q. Did you ever imply that bricks and masonry were falling because of T-Mobile and no other reason?
> A. Yes, like I said, when you asked me about the picture and the back wall, I said the bricks were falling and it could have been attributable to the wall moving forward by T-Mobile's equipment pulling it.

*Id.* at 2435. Thus, Yen consistently said that T-Mobile caused the parapet wall to move, which caused or may have caused damage; the 4-Point Report was not "embellish[ed]." *See id.* at 253, ¶34.

The excerpt of Yen's deposition testimony attached to T-Mobile's sanctions motion omitted pages 194 and 195, which included the testimony above. Instead, T-Mobile attached and directed the district court's attention to the discussion of negligence on page 193, which was a red herring. Even more disturbing—given

22

that punitive sanctions are akin to a criminal penalty—T-Mobile also omitted the portion of Yen's testimony where Yen was asked point blank who wrote the 4-Point Report:

> Q. Who changed the wording from the nine-bullet point to the four-bullet point?
> A. That would be me because it was specifically written just for the T-Mobile section. Why would they want to read the whole letter here?
> Q. Did you have any help?
> A. No.
> Q. Did anybody suggest any language?
> A. Did anybody suggest any, no.

*Id.* at 2436.

Thus, T-Mobile's entire "forgery" story was not just unsupported; it actually was contradicted by the record. All that the evidence shows is that the 4-Point Report was a document that Yen himself created in an attempt "to specifically give [T-Mobile] their portion" of the repairs. *Id.* at 365. We have found no evidence in the record showing that any documents were forged.

### C. "Bad Faith Attempt to Double [the] Recovery"

Virginia Properties sought approximately $700,000 from T-Mobile, consistent with its position that most of the repairs performed by DNS were

23

attributable to T-Mobile's cell tower equipment.[13]  The district court essentially found that to be frivolous and "that the plaintiff, and its managing member Spring, intentionally included unrelated expenses in their alleged damages in this lawsuit in order to nearly double their potential recovery."  Special App'x at 6.  The Supreme Court's recent decision in *Goodyear* suggests that (1) if the district court's findings were correct, and (2) if T-Mobile offered to settle for the entire amount of damages actually attributable to its cellular equipment, then continuing this litigation solely to harass or to obtain a windfall might well have been sanctionable conduct supporting an award of all costs and attorney's fees. But there is no evidence that the plaintiff's position on damages is frivolous.  As with the "apparent forgery," the district court's findings on this issue relied on the Rapaport Declaration's inaccurate characterization of Yen's testimony.

The district court found that "[s]everal categories of work listed in the suppressed documents, including brickpointing, lintel work, and wall repairs . . . cannot credibly be attributed to damage that could have been caused by the cell

---

[13] The district court's decision states that "[t]hroughout the litigation, the plaintiff maintained that T-Mobile was responsible for the entirety of the price for repairs performed by [DNS]."  Special App'x at 2.  As noted above, however, Virginia Properties actually provided to its attorneys documents acknowledging that at least some small amount of repairs were not attributable to T-Mobile.  *E.g.,* App'x at 336.

tower equipment that T-Mobile stored on the roof of plaintiff's property." *Id.* at 3-4. Citing all 20 pages of Yen's testimony attached to the Rapaport Declaration, the district court further found that "brickpointing, waterproofing, and lintel work—all of which Yen has testified have 'nothing to do' with T-Mobile, accounted for more than $320,000 of the total work." *Id.* at 8; *see also id.* ("Plaintiff's engineer, Ted Yen, testified that this brick pointing, waterproofing, and lintel work cannot reasonably be ascribed [as] damage which could have been caused by T-Mobile's storage of cellular equipment on the roof of the building."). But nowhere in the cited deposition testimony did Yen state that the T-Mobile equipment had "nothing to do" with any brick pointing, waterproofing, or lintel work; rather, that simply was how the Rapaport Declaration characterized Yen's testimony.

In fact, Yen's testimony is at worst ambiguous on whether brick pointing, waterproofing, and lintel work were necessitated by the damage related to the T-Mobile equipment. It may raise an issue of fact about the damages caused by T-Mobile. But it certainly does not reveal the position of Virginia Properties to be frivolous, contrary to what T-Mobile led the district court to believe.

During his deposition, Yen was asked if he would agree that "the roof deteriorat[ing] and reach[ing] the end of its life expectancy" was "something that T-Mobile had nothing to do with." App'x at 367. He agreed with that commonsense proposition. *Id.* at 367-68. Brick pointing, waterproofing, and lintel work are not mentioned on either page, and the line of questioning appeared to concern "[g]eneral maintenance issues." *Id.*

Yen also testified that items 1-7 of the 9-Point Report "relate to maintenance issues that aren't specifically attributable to T-Mobile," *id.* at 544— an assertion that is ambiguous. For example, in Item 1 of the 9-Point Report, Yen had said that "loose bricks were observed on the exterior masonry walls around the *entire building*." *Id.* at 319 (emphasis added). So, according to Yen's testimony, that issue with the "entire building" was not "specifically attributable to T-Mobile." But it is a stretch to construe Yen's answer to mean that *no* loose bricks *anywhere* on the building were attributable to T-Mobile—especially when Yen specifically said elsewhere that "bricks were falling and it could have been attributable to the wall moving forward by T-Mobile's equipment pulling it." *Id.* at 2435.

26

Yen also was asked a number of questions about the "rear wall of the building," which all parties agree was not damaged by T-Mobile. *Id*. at 2431-32. During the course of those questions, Yen was asked about lintel repair and brick pointing. He said that lintel repair was necessary "most likely due to age," and that as to the need for brick pointing, "[s]ome of it was weathering, some of it was age, and some of it was obvious, there were cracks in it." *Id.* at 2431. But it is not at all clear that this testimony referred to the whole building, as opposed to just the rear wall (which, according to the 9-Point Report, had "three longitudinal cracks," *id.* at 319). In other words, lintel repair and brick pointing other than on the "rear wall of the building" may or may not be related to the damage caused by T-Mobile. Presumably, that issue will be addressed by expert testimony on damages.

As for "waterproofing," that was not mentioned in Yen's testimony at all,[14] so there is nothing that supports the Rapaport Declaration's assertions or the

---

[14] Although Yen mentions a way that "coping stones" can be used to keep out water, *id.* at 2431, his testimony suggests that coping stones were replaced on the T-Mobile section. *Id.* at 2432. In any event, coping stones and waterproofing are listed separately both in exhibits attached to the complaint and in the J-51 and MCI documents.

district court's decision that "waterproofing" was necessarily unrelated to the T-Mobile damage.

Moreover, to the extent that the cited portions of Yen's testimony might be read to suggest that any and all brick pointing or lintel work was not related to T-Mobile, other portions of Yen's testimony suggest the exact opposite:

A. My responsibility was solely to design and apply for the permit to fix the portion of the building in and around the T-Mobile equipment.
Q. Nothing else?
A. Nothing else.
Q. What about lintels?
A. Lintels, as pertaining to right in that area, yes.
Q. What about brick pointing?
A. Yes.

*Id*. at 2429.

The J-51 and MCI documents that Virginia Properties produced late in the game—in June and July 2015—were the basis for the district court's calculation that more than $320,000 of the plaintiff's claimed damages cannot reasonably be ascribed to T-Mobile. But apart from the mere fact that those documents label certain repairs as brick pointing, waterproofing, or lintel work, they do not independently prove that Virginia Properties' claims are unrelated to damage caused by T-Mobile. Yen's testimony—to the extent that it concerned brick

28

pointing, waterproofing, and lintel work—therefore was the linchpin of the district court's conclusion that the plaintiff's damage claim was frivolous. *See also* Special App'x at 10 ("Based on the facts . . . , especially the inconsistencies between Ted Yen's testimony and the Plaintiff's narrative, I am convinced that both counsel and the plaintiff have acted in bad faith."). And Yen's testimony simply did not support that conclusion.

Furthermore, it is worth noting that despite their characterization in the Rapaport Declaration, the J-51 and MCI documents appear to be largely consistent with Virginia Properties' theory on damages. For example, with respect to a contract submitted in connection with the J-51 application, the Rapaport Declaration states:

> The February 5 Contract[15] specifies that brick pointing, waterproofing and structural repairs to cracks on the Building's rear wall (all work that Plaintiff's engineer testified had "nothing to do with" T-Mobile) accounted for $243,175 of DNS's price tag, and brick replacement accounted for another $62,607. The parapet walls at the south and east exposures (some of which Plaintiff alleges were leaning due to the communication facility) only accounted for $253,120 of DNS's total price of $692,012.

---

[15] App'x at 302-03. The Rapaport Declaration repeatedly refers to this document, claiming that Virginia Properties "intentionally withheld [it] until July 7, 2015." *Id.* at 252.

29

App'x at 252-53. But comparing that assertion to the actual contract is illuminating: The $243,175 item in the contract included, among other things, "[p]ointing to be done to the following areas; East and South sides of the building." *Id.* at 302. It also included "waterproof coating to the following areas: The East and South sides of the building." *Id*. Likewise, the $62,607 for brick replacement was for "the East and South elevations." *Id.* So while the Rapaport Declaration made it appear as though the $243,175 and $62,607 items in the contract clearly had nothing to do T-Mobile, those items specifically concerned the east and south sides of the building, and it is undisputed that *T-Mobile's equipment was located atop the southeast corner* (a fact that the above-quoted paragraph from the Rapaport Declaration even recognized). The unrelated "rear" wall is the *west* side of the building.

The only expert evidence in the record (submitted after the initial sanctions decision) also supports Virginia Properties' position. That expert opinion explains how the repairs listed in the J-51 and MCI applications correspond with the square footage of the area potentially damaged by T-Mobile's equipment; how brickwork and the replacement of steel lintels would be required to support the southeast parapet; and how certain items might have been referred to

30

differently in different documents. In other words, at least according to the plaintiff's expert, the brick pointing, waterproofing, and lintel work in and around the area where T-Mobile had its equipment might well have been necessary to remedy the damage caused by T-Mobile. If that turns out to be demonstrably incorrect, and if Virginia Properties improperly tried to shoehorn those repairs into T-Mobile's damages, then sanctions in an amount related to that conduct might be warranted. But without expert testimony on damages, that is impossible to determine. And in any event, the record as it now stands does not support such sanctions.

Thus, there was nothing in Yen's testimony that showed Virginia Properties' position to be frivolous, and the J-51 and MCI documents are largely consistent with its theory.[16] T-Mobile's claims of bad faith ultimately presented only a damages issue for trial, not grounds for sanctions.

---

[16] It is true that the amount $692,012—or an amount quite close to that figure—repeatedly appeared on documents in which DNS provided a repair cost estimate, and even on some that appeared to include work to the rear wall. But according to the plaintiff's expert, the "quantities of work listed in the DNS Contract and the J-51 Application (except for the oil burner) are generally related only to the areas where the T-Mobile equipment was installed and thus are related to the alleged T-Mobile work." *Id.* at 2275. Only a "minor percentage of the work may extend into areas that are unrelated to the T-Mobile equipment." *Id.* at 2275-76. So while the $692,012 figure on some application documents may to some extent be questionable, that does not mean

**CONCLUSION**

The record contains no evidence of deceit and evidence that is at best inconclusive as to whether Virginia Properties asked for twice what it was entitled to. The story the sanctions motion told—one of suppressed documents uncovered late in the litigation that blew a hole in the plaintiff's damage claim— appears to have been based on little more than speculation and cherry-picked deposition testimony. And while some sanctions may have been warranted due to the late production of documents, the fault for that may well lie with the plaintiff's prior counsel—not with the plaintiff itself.

Accordingly, the judgment of the district court is hereby **VACATED** and **REMANDED**[17] for a determination of the amount of costs and attorney's fees that should be awarded solely to compensate appellees for the failure of Virginia Properties or its attorneys to make timely disclosures.

---

that Virginia Properties' position was frivolous. Moreover, DNS and Yen are third parties, and in the absence of evidence showing that Virginia Properties was directing them to be deceitful, Virginia Properties should not be sanctioned simply for relying on inaccurate or inconsistent information that they provided.

[17] Virginia Properties has argued that this case should be reassigned on remand because it believes the district court "will have substantial difficulty putting out of its mind those facts which led it to the overly harsh imposition of sanctions." Pl. Br. at 32. We see no reason why that relief is warranted here.